**JEFFERSON v. HELVERING, Commissioner of Internal Revenue, et al.**

No. 7556.

United States Court of Appeals for the District of Columbia.

Decided Feb. 17, 1941.

D. H. Blair and George D. Brabson, both of Washington, D. C., for petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and Newton K. Fox, Sp. Assts. to the Atty. Gen., Department of Justice, and J. P. Wenchel, Chief Counsel, and Irving M. Tullar, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for respondent.

Before GRONER, Chief Justice, and VINSON and RUTLEDGE, Associate Justices.

VINSON, Associate Justice.

The Board of Tax Appeals has agreed with the Commissioner's determination that the petitioner has a deficiency in his income tax return for the year 1935, since he is not entitled to deduct, as he did, premium payments on five insurance policies. The Board found the facts as stipulated by the parties. Our statement of the case is based upon the stipulation.

The taxpayer was a member of the Iselin-Jefferson Company partnership. The other partner, William Iselin and Company, also a partnership, furnished most of the capital. The taxpayer furnished his services. The taxpayer had valuable connections with two textile mills, the Fitzgerald and the Cochran Cotton Mills. The Iselin-Jefferson Company acted as a selling agent for these Mills among others. Both Mills were indebted to William Iselin and Company, and to the Chemical Bank and Trust Company of New York. The Mills needed further financing and the creditors desired some additional guaranty of their accounts. The taxpayer's position became seriously involved, and the dissolution of the Iselin-Jefferson Company partnership, his chief source of livelihood, was being considered. Accordingly, the taxpayer in 1931 named the William Iselin and Company partnership the beneficiary in four insurance policies to secure his guaranty of the obligations of both Mills, and in 1932 assigned one of his policies to the Bank to secure his guaranty of the Fitzgerald debt. The taxpayer paid the premiums on the five policies in 1935. It is this item that is in dispute.

The Commissioner argues that the insurance premiums are not deductible from gross income because they fall under the general provision of Section 24 (a) (1)[1] which disallows any deductions for personal expenses. It is argued further that Section 24 (a) (4), which allows no deductions for premiums paid on insurance covering the life of anyone financially interested in the taxpayer's business where the taxpayer

---

[1] This case arises under the Revenue Act of 1934; all sections mentioned are of that Act. U.S.C.A.Int.Rev.Code, Tit. 26.

is a direct or indirect beneficiary, is specifically applicable.

It is clear that when a policy is used to secure a debt the premiums cannot be deducted.[2] The taxpayer concedes this and so the question is whether he has brought his case out of the general rule. In his attempt to show that this is a special case, the taxpayer contends that he has ceased to be a beneficiary,[3] that the insurance was not pledged to secure a loan as in the usual case but was in substance a contract of indemnity, and therefore the premium payments are deductible as business expenses under Section 23 (a).

The facts tend to reveal, however, that the assignment and the changes in beneficiaries were meant to affect additional security for an earlier endorsement of a debt rather than to create a contract of indemnity. The policy assigned to the Bank on May 3, 1932, shows that the Bank was made the beneficiary when it was issued on December 22, 1925. Since under the terms of this policy the taxpayer could change the beneficiary unless assigned, it is probable that the Bank, in 1932, was protecting its security. The language of the petition to the Board,[4] the stipulation of facts,[5] the opinion of the Board,[6] and the petition for review,[7] indicates that the transactions involving the five insurance policies resulted from the taxpayer's necessity of furnishing additional security for debts already endorsed. Apparently, then, the taxpayer was secondarily liable on the Mill accounts before 1931. In addition it should be remembered that the Iselin-Jefferson Company had obtained most of its capital from William Iselin and Company; the former probably remained a debtor of the latter and may well have been in the position to be called upon to make good any loss on the Mill accounts. If this were so, Jefferson by his status as a partner, was contingently liable on the Mill debts. At any rate it appears that the assignment and changes in beneficiaries were made in order to give the creditors further security.

Even if this were the first time that the taxpayer endorsed the Mill accounts, it would seem that the insurance transactions were more that of securing the debts assumed than the making of an indemnity contract. At the outset the taxpayer's analogy to a contract of indemnity lacks perspicuity. From the facts, as stipulated, it would seem that the taxpayer was trying to protect his source of livelihood. In his petition for review here, and as far as we can tell for the first time, the taxpayer emphasized the importance to the partnership of his services. As his petition comes to a conclusion, however, he reasons that under his indemnity contracts he had to pay the insurance premiums in order to keep the Mills operating and his partnership together to save his interest in the latter. Nonetheless his brief stresses that the partnership demanded some indemnity to insure his continued services. The brief impliedly admits that if the transaction were for his personal benefit, he should pay the tax. The events leading up to the transaction make it appear as though the taxpayer was preserving his source of livelihood, and in the next to the last paragraph of his brief he again points out this conclusion.[8] If the partnership were worried about losing his services it would be rea-

---

[2] Klein v. Com'r of Internal Revenue, 7 Cir., 84 F.2d 310; Rieck v. Heiner, D.C. W.D.Pa., 20 F.2d 208; Id., 3 Cir., 25 F.2d 453; Barron v. Com'r of Internal Revenue, 14 B.T.A. 1022.

[3] On this point the taxpayer calls attention to Art. 24-3 of Income Tax Regulations 86: "If, however, the taxpayer is not a beneficiary under such a policy, the premiums so paid will not be disallowed as deductions merely because the taxpayer may derive a benefit from the increased efficiency of the officer or employee insured." "Such a policy" is one by which the taxpayer for the purpose of protecting himself insures the life of a business associate. This is not that kind of policy.

[4] "Before the Iselin-Jefferson Co. became the * * * selling agent for these two mills and would extend credit to them * * *, it was necessary to obtain some endorsement of their credit accounts. * * * Accordingly the petitioner agreed to endorse the credit accounts of the two mills, * * * As the depression continued, * * * the petitioner was called upon for some additional guaranty of his endorsement. * * * * "

[5] "Petitioner was accordingly confronted with the necessity of furnishing some additional guaranty which would enable him to retain the two accounts. * * * * "

[6] In language similar to fn. 5.

[7] In language similar to fn. 5.

[8] "Undoubtedly the prime purpose of the taxpayer was to secure to Iselin-Jefferson Company the continuation of his services and his contacts with various textile manufacturers and to save that partnership from dissolution, *because that*

sonable to suppose that the Company would take out insurance on the taxpayer's life, name itself beneficiary, and pay the premiums. We cannot tell whether the "contract" was to indemnify himself against loss of livelihood, or to indemnify the partnership against loss of his services. Probably he means both, but the transaction still appears to us to be more in the nature of securing a debt than of indemnifying anybody. He may have been protecting himself and the partnership, but he was indemnifying neither except in the sense that collateral on a debt would so do.

Even if the taxpayer used his insurance as an indemnity bond, inter alia, that would not mean necessarily that he should be outside of the general rule of non-deductibility of premium payments. An insurance policy is a functional instrument, likewise an indemnity bond, but they serve different functions. Payment of a premium on an indemnity bond takes care of a risk cost. Payment of an insurance premium does this and also builds an equity. Granting, contrary to our determination, that this taxpayer used his insurance to serve the added function of an indemnity bond, he still retains an estate which will in all probability benefit him.

The taxpayer counters by stating that he lost his equity in the policies inasmuch as they were irrevocably assigned. The instrument assigning the policy to the Bank provided that the object and the extent of the assignment is to secure the assignee against the indebtedness. Hence, if the debt is paid, the assignment ceases. In the four policies in which the beneficiary was changed to William Iselin and Company, the taxpayer retained his general power under the policies to further change the beneficiaries. If the debts were paid, therefore, the taxpayer would be free to name other beneficiaries including himself.[9] The record even fails to show how William Iselin and Company could prevent a change in the beneficiary before the debt was paid; it may be that there was a contractual agreement as to the taxpayer's liability and behavior or that he delivered the policies to the creditor.

The taxpayer suggests that perhaps the best test of the irrevocability of these assignments is to ask the question who would have received the proceeds of the policies if he had died in 1935. Then he shows that the monies would have gone to these particular creditors, and says his estate would not have received anything. This is true whenever a policy is put up as security on a debt equal to or larger than the face value of the policy and the obligation must be paid through the use of the collateral at the insured's death. And so this test of irrevocability suggested by the taxpayer goes not so much to the legal nature of the assignments as to whether he will receive any actual economic benefit from the policies. In this light, if the policies are used to pay the debt, it would seem that there is still a benefit to the taxpayer for his liabilities will be reduced.[10]

This brings us to the taxpayer's contention that since he was hopelessly insolvent, and since the Mills faced disaster when the guaranty was made, his beneficial interest was gone factually. His statement of financial condition, as of 1935, shows assets of over $161,000. He owed his partnership $159,000, and others about $20,000. This does not show hopeless insolvency.[11] Furthermore, the value of his partnership interest is not listed among his assets. His return for 1935 shows an income of $29,900 from the partnership.[12] Its value to him would seem to be more than the $18,000 needed to balance the deficit.

---

partnership was the taxpayer's only source of livelihood." (Italics supplied)

[9] In the Klein case the taxpayer named the creditor, as trustee, the beneficiary. He did not reserve the right to change beneficiaries. In Parker v. Com'r of Internal Revenue, 13 B.T.A. 115, the taxpayer named his creditors as beneficiaries, but the Board said it may be supposed that if the policy survived the indebtedness the taxpayer would become a direct or indirect beneficiary.

[10] Rieck v. Heiner, D.C.W.D.Pa., 20 F.2d 208, 211; Id., 3 Cir., 25 F.2d 453, 454.

[11] We do not inferentially hold that if the taxpayer had been hopelessly insolvent the premium payments would have been deductible. Compare Parker v. Com'r of Internal Revenue, 13 B.T.A. 115. The reasoning of Quinn v. Com'r of Internal Revenue, 31 B.T.A. 142, relied upon by the taxpayer would not necessarily be applicable.

[12] This reveals the substantial value of the partnership to the taxpayer, and, as has been shown, is one of the reasons he put up the policies as collateral on the Mill debts. With such an income, the taxpayer can pay the premiums. Hence the very use to which the policies were put enables the taxpayer to keep them alive and to preserve his equity.

Of course he has guaranteed the accounts of the Mills amounting to around $545,000. He pledged $178,000 worth of insurance on this guaranty. This liability is contingent. The Mills are the primary debtors. It cannot be assumed that they will default. The record merely shows that in 1931 they had large debts, were seriously pressed for funds, and could not receive further credit on their own. It does not show that they were insolvent then, much less in 1935. Assuming that they were insolvent in 1935 these debts might be paid. The taxpayer states that this is not the ordinary case of the payment of insurance premiums on policies pledged to secure a loan of the taxpayer. With this we agree, but add, it is the stronger case of a pledge to secure the debt of another with no clear showing that the primary obligor will not be able to meet the obligation.

The taxpayer, trying to clinch his argument that his equity in the insurance is completely gone, says that the argument that he might become a beneficiary is based upon three contingencies—if the two insolvent cotton Mills pay their debts in full, if the taxpayer is able to keep up the premiums, and if the taxpayer happens to be living when the debts are paid. But such verbal niceties can be marshaled the other way. The taxpayer will be a beneficiary before or at his death unless none of the following has happened: payment of the debts in full, or in sufficient part to make the value of the policies exceed the unpaid portion by the Mills or the taxpayer;[13] the substitution of other security for the policies; a showing that the taxpayer's estate has not in fact received a benefit by the use of the collateral in paying the debts even though it appears that the liabilities would be reduced by the amount of the insurance proceeds.

Laying aside such hypothetical reasoning, the taxpayer, although he has made an earnest argument, has simply failed to show why his action of assigning and changing beneficiaries was not the usual case of pledging personal insurance for a debt one has chosen to assume. The taxpayer says that substance—not form should control. To this all will agree. In making his argument, however, the taxpayer under-emphasizes the substance of insurance. A holder of an insurance policy is continually building an estate. That estate usually inures to his benefit or satisfaction. The taxpayer has not shown that his case is so different that he does not now have or will never have the direct or indirect benefit of his insurance and that he should escape the generally applied law in this field.

The decision of the Board of Tax Appeals is affirmed.

Affirmed.

[13] In this connection it should be noted that when this proceeding started the taxpayer included the premium payment on a $10,000 policy which originally named as beneficiary the Georgia Holding Company, a creditor of the taxpayer. This indebtedness was paid in 1937. The beneficiary has since been changed to the taxpayer's estate and then to Oliver Iselin. The payment of the Georgia Holding Company debt may well exemplify what will happen to the present contingent debts.