JOHN D. CARBINE AND ELEANOR W. CARBINE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 26092-81.　Filed September 18, 1984.

---

*Harry K. Mansfield*, for the petitioners.
*Paul J. Dee*, for the respondent.

OPINION

RAUM, *Judge*: The Commissioner determined deficiencies in petitioners' Federal income tax in the amounts of $12,937.90 and $2,354.41 for 1977 and 1978, respectively. After concessions, the sole issue for decision is whether petitioners may deduct premiums paid with respect to an insurance policy on the life of petitioner John D. Carbine. The case was submitted on the basis of a stipulation of facts.

Petitioners John D. Carbine (sometimes hereinafter referred to as petitioner or Carbine) and Eleanor W. Carbine, husband and wife, resided in Haines City, FL, when they filed their petition herein. They timely filed joint Federal income tax returns for the calendar years 1977 and 1978 with the Internal Revenue Service at Andover, MA. These returns list Carbine's occupation as "attorney," and attached Forms W-2 show his "Wages, tips and other compensation" (presumably related to his occupation as an attorney) to be $91,347.20 for 1977 and $105,496.85 for 1978.

During the years in issue, Carbine resided in Vermont and practiced law in that State. Among other investments, he held a 20-percent stock interest in Burgess-Carbine Associates, Inc. (BCA), a Vermont corporation engaged in the business of a general insurance agency. The other shareholders of BCA, each of whom also owned 20 percent of BCA's stock, were Stephen A. Carbine (Carbine's son), Ronald N. Burgess, Mr. Burgess' mother-in-law, and Mr. Burgess' brother.

On November 28, 1973, BCA obtained a loan commitment from First Vermont Bank & Trust Co. (the bank) for the purpose of financing the purchase of the L.A. Appell Agency (the agency), an insurance agency then owned by Leonard A. Appell (Appell). The bank agreed to advance BCA an initial amount of $65,000, with subsequent advances to be made up to a total of $225,000. The commitment provided that an aggre-

gate of $125,000 would be advanced on an unsecured basis (subject to a review of the combined operating figures for BCA and the agency as of September 30, 1974) with the remainder secured by stocks and bonds. In addition, it specifically required Carbine to guarantee all BCA notes issued under the commitment and to hypothecate the stocks and/or bonds needed to secure the loan.

On December 14, 1973, BCA and Appell entered into an agreement whereby BCA purchased all of the agency's assets for $250,000.[1] Under the terms of the sales agreement, BCA was required to pay $5,000 of the purchase price immediately and the remainder in equal installments of $20,416.67 on the 10th day of January, April, July, and October of 1974, 1975, and 1976. The bank disbursed the initial $65,000 loan amount to BCA as follows:

$5,000 – Initial deposit
20,000 – January 1974
20,000 – April 1974
20,000 – July 1974

Subsequent to these disbursements, the bank made several additional advances pursuant to the loan commitment, all of which were evidenced by notes to BCA.

The record is unclear as to whether Carbine in fact ever hypothecated any securities pursuant to the loan commitment. However, on October 8, 1975, in a transaction independent of that loan, Carbine signed a general hypothecation agreement covering all obligations of BCA to the bank whenever arising. Pursuant to this latter agreement, Carbine pledged certain securities and insurance policies[2] which he owned to the bank.

In 1976 BCA sold the major part of its assets and its casualty insurance business to Smith-Bell, another insurance agency, for cash and a note. Thereafter, BCA continued to conduct only a small volume of life insurance and pension business.

On November 1, 1976, the outstanding notes of BCA under the 1973 loan commitment were consolidated into a single new 7-year term note of $137,000. Carbine guaranteed this term note as an endorser and, "Pursuant to [this] * * * term Loan

---

[1] The purchase price was subject to adjustment in the event that certain commercial insurance policies were not renewed.

[2] All but one of the insurance policies were "fully paid."

* * * pledged stock owned by him to the Bank to secure BCA's indebtedness."[3] Under the provisions of this term note, the bank could dispose of the pledged stock if BCA defaulted on its obligations or if the bank determined that the collateral available to it had become insufficient to secure BCA's obligations unless additional collateral was deposited or the note was paid down.

On January 24, 1977, BCA obtained an insurance policy on Carbine's life (the policy). The policy listed BCA as its owner and BCA and the First National Bank of Boston, Trustee of the John D. Carbine Trust dated May 19, 1975,[4] as its beneficiaries. On March 3, 1977, BCA assigned the policy to the bank as additional security for the term note. BCA also altered the policy's beneficiary designation so as to eliminate any interest of the First National Bank of Boston, Trustee of the John D. Carbine Trust, and so as to provide that the policy's proceeds would continue to be payable to BCA to the extent of any premiums that had become due and been paid at the time of Carbine's death, less any policy indebtedness. The bank's interest as assignee of the policy does not appear to have been adversely affected.

During 1977 and 1978, BCA encountered financial difficulties and became unable to pay both the amounts owing on the term note to the bank and the policy's premiums. BCA chose to apply its limited funds first to the payment of the term note[5] and then to the payment of some of the premiums. Because nonpayment of the premiums would have allowed the bank to sell the securities owned by Carbine and held by the bank under the general hypothecation agreement and the term loan, Carbine personally paid all premiums on the policy which were not paid by BCA. BCA was not obligated to, and did not in fact, reimburse petitioner Carbine for these payments.

Carbine made total premium payments with respect to the policy of $14,486.59 in 1977 and $8,912.73 in 1978. Petitioners treated these amounts as expenses incurred "to protect * * *

---

[3]The record is unclear as to whether this "stock" is other than those securities pledged with respect to the general hypothecation agreement.

[4]The nature of this trust is not explained in the record.

[5]There is no indication in the record that such payment on the term loan constituted a sufficient reduction thereof as to leave existing collateral adequate (without the insurance policy) to secure the note, and the fair inference is otherwise.

collateral" and claimed a deduction under section 212, I.R.C. 1954, for the respective amounts on their 1977 and 1978 Federal income tax returns. In the deficiency notice herein, the Commissioner disallowed these deductions on the ground that petitioners had not established that the amounts were "ordinary and necessary business expenses [within section 162(a)]."

Petitioners never did claim any such section 162(a) "business" expense deduction; their sole position rests upon section 212(2), and indeed they argue affirmatively, as will hereinafter appear, that the expenses were not incurred in any trade or business conducted by Carbine. Their basic position is that the claimed deduction is allowed by section 212(2) since the payments were made to protect Carbine's securities which had been put up as collateral for the bank's loan to BCA. The Commissioner now contends (1) that section 212(2) is inapplicable because the payments were not "ordinary and necessary," (2) that in any event, the deduction is forbidden by section 262 relating to "personal, living, or family expenses," and (3) that it is also foreclosed by section 264(a)(1) relating to life insurance premiums. We shall proceed to consider each of these points.

1. *Section 212(2).*—The pertinent provisions of section 212(2) of the 1954 Code allow a deduction to individuals for all the "ordinary and necessary expenses" incurred or paid "for the management, conservation, or maintenance of property held for the production of income." These provisions had their origin in section 23(a)(2) of the 1939 Code, which had been added to that Code in 1942 by section 121 of the Revenue Act of 1942, 56 Stat. 798, 819. Theretofore, deductions for "ordinary and necessary" expenses were allowed under section 23(a) of the 1939 Code only with respect to the carrying on of a "trade or business." The 1942 amendment divided the old section 23(a) into two parts, one, section 23(a)(1), dealt with the previously deductible "trade or business" expenses, now covered by section 162 of the 1954 Code; the other, section 23(a)(2), dealt with a new category of deductions relating to non-trade or non-business expenses, now covered by section 212 of the 1954 Code involved herein. These new provisions were intended to allow deductions in respect of certain income or profit-oriented situations, notwithstanding the absence of a related

"trade or business." But all the other requirements for deductibility of "trade or business" expenses remained applicable to this new class of nontrade or nonbusiness deductions. See *Trust of Bingham v. Commissioner*, 325 U.S. 365, 373–374 (1945); *Davis v. Commissioner*, 4 T.C. 329, 334 (1944). It is the Government's contention that petitioner's payment of premiums involved herein fail to satisfy one of those requirements, namely, that the payments must qualify as "ordinary and necessary" expenses. We hold otherwise.

Petitioner had guaranteed BCA's indebtedness to the bank, and had pledged his securities as collateral. Moreover, in order to provide additional security, BCA had taken out an insurance policy on petitioner's life; as owner of the policy, BCA assigned it to the bank as security for the note, and eliminated the John D. Carbine Trust as a named beneficiary. As things thus stood, BCA's failure to maintain the policy by paying the premiums would cause the policy to lapse, and, in such circumstances, the bank had the right to dispose of petitioner's pledged securities if the total collateral should become insufficient to secure BCA's outstanding indebtedness to the bank.

BCA came upon hard times, and notwithstanding its obligation to pay the premiums on the policy, it was unable both to make the required payments on the note and to pay the premiums in full. It elected to use its limited resources in the first instance for payments on its note to the bank, and was thus left without sufficient funds to carry out in full its contractual obligation to maintain the policy. Petitioner was then faced with the very real hazard of losing his pledged securities unless he himself paid that portion of the premiums that remained unpaid. The parties have stipulated the circumstances of petitioner's payments here in controversy as follows:

> Because non-payment of the premiums would have allowed the Bank to sell the securities owned by petitioner Carbine and held by the Bank under the general hypothecation agreement and the term loan, petitioner Carbine personally paid all premiums on the life insurance policy which were not paid by BCA. BCA was not obligated to, and did not in fact, reimburse petitioner Carbine for these payments.

In the light of the foregoing, it is difficult to imagine a more direct or proximate connection between the payments thus made by petitioner and his reasonable effort to protect his pledged securities. In the language of section 212(2), such

payments were made for the "conservation" of petitioner's securities held "for the production of income"[6] that had been pledged to the bank.

The Government argues, however, that since it was BCA's obligation to pay the premiums and since any such payment by BCA would be deductible by it as an "ordinary and necessary expense" of *its* business, the voluntary payment by Carbine of BCA's expense in discharge of its obligation cannot qualify as *his* deductible "ordinary and necessary" expense. The point is specious. That such expenses might have been "ordinary and necessary" in respect of BCA had it made the payments is not inconsistent with such classification in respect of Carbine's payments that were made for entirely different reasons. His payments were directly and proximately connected with the protection of his own pledged securities. In this respect, the instant case is unlike *Deputy v. du Pont*, 308 U.S. 488 (1940), where the Court noted (p. 494) that the payments there involved resulted "proximately * * * not from the taxpayer's business but from the business of the du Pont Company." In sharp contrast, the payments here resulted proximately from petitioner's own situation, notwithstanding that they also served a very good purpose for BCA.

Nor is it of critical significance that petitioner might have avoided losing (or at least have delayed the loss of) his securities by putting up additional collateral instead of paying the insurance premiums. For whatever reason, he chose to pay the premiums rather than to put at risk even more of his own property, and we will not undertake to second guess why. The point is that the course he followed was in fact clearly and reasonably related to the "conservation" of his securities, notwithstanding that he might conceivably have attained that objective in some other manner.

The Government pursues the matter further, focusing separately on each of the words "ordinary" and "necessary," and contends that the payments were neither "ordinary" nor "necessary." Here again, we disagree on the record before us. As to the "ordinary" requirement, the statute "does not mean that the payments must be habitual or normal in the sense

---

[6]Although the record does not affirmatively establish that such securities were "held for the production of income," the parties have appeared to proceed on the assumption that they were so "held," and we do not regard the matter as being in controversy.

that the same taxpayer will have to make them often." *Welch v. Helvering,* 290 U.S. 111, 114 (1933). The requirement is satisfied if the payment is one that may ordinarily or customarily be made by a person in the taxpayer's position in response to a situation like the one faced by the taxpayer. Cf. *Welch v. Helvering, supra* at 114. Indeed, it has been recognized that an "expense may be ordinary though it happen but once in the taxpayer's lifetime." *Deputy v. du Pont,* 308 U.S. at 495. The meaning of "ordinary" in the context of the statutory provisions before us was also indicated in *Commissioner v. Heininger,* 320 U.S. 467, 472 (1943), where that word was regarded as being the equivalent of "normal," or "the response ordinarily to be expected." In our judgment, petitioner's response here in paying the premiums was a "response ordinarily to be expected" of a person in his situation. It was "ordinary" within the meaning of the statute.

To be sure, as argued by the Government, it is not "ordinary" for one to pay the debts of another. *Welch v. Helvering,* 290 U.S. at 111. But the rule of *Welch v. Helvering* is not inflexible; circumstances may exist calling for a different result (cf. *Lohrke v. Commissioner,* 48 T.C. 679, 684–687 (1967)). And in our view, not only were such circumstances present here, but petitioner's payments of the premiums were motivated by considerations peculiar to himself that were extraneous to the interests of BCA.

As to the "necessary" requirement, we need only call attention to the fact that "necessary" is not used in the statute to mean "indispensable" or to require that the taxpayer be legally obligated to make the payment. See *Waring Products Corp. v. Commissioner,* 27 T.C. 921, 929 (1957). A payment may qualify as "necessary" if it is "appropriate and helpful." See *Commissioner v. Heininger,* 320 U.S. at 471; *Welch v. Helvering,* 290 U.S. at 113. On the record before us, we find that Carbine's payments here were "appropriate and helpful" and therefore "necessary."

We add a final word on the "ordinary and necessary" requirement. The number of cases in this field runs well into the hundreds, and it would serve no useful purpose to undertake a comprehensive analysis of them. Many are borderline and some are arguably inconsistent with others. Cf. *Welch v. Helvering,* 290 U.S. at 116: "To attempt to harmonize

them would be a futile task." In *Deputy v. du Pont*, 308 U.S. at 496, the Court stated "Review of the many decided cases is of little aid since each turns on its special facts." We decide the present case on the facts before us, and find that on this record, the payments were "ordinary and necessary," notwithstanding some troubling language in *O'Donohue v. Commissioner*, 33 T.C. 698, 701 (1960), a case presenting an analogous but nevertheless a different set of facts.

2. *Section 262.*—The 1954 Code provides in section 262 that "Except as otherwise expressly provided in this chapter, no deduction shall be allowed for personal, living, or family expenses." The Commissioner relies upon this provision, and particularly upon section 1.262–1(b)(1) of the related income tax regulations. The regulations undertake to give examples of nondeductible personal, living, and family expenses the first of which is stated as follows: "(1) Premiums paid for life insurance by the insured are not deductible." We hold that the statute and regulations were not intended to rule out the claimed deduction here in issue.

The statute was obviously referring to expenses incurred in a personal context, unrelated to the taxpayer's business or to his income or profit-oriented activities. And since life insurance maintained by the insured is ordinarily of a "personal, living, or family" character, the regulations quite properly characterized life insurance premiums as an example of a nondeductible expense. But although the regulations are phrased in general terms, they do not go further to state specifically that life insurance premiums paid in an exclusively business or profit-oriented context are always nondeductible. To have done so would have run afoul of the explicit provisions of sections 162 and 212 of the 1954 Code and the "Except as otherwise expressly provided in this chapter" language of section 262 itself. Notwithstanding the generality of the terms of section 1.262–1(b)(1), Income Tax Regs., we think that it was never intended to render nondeductible the payment of *all* life insurance premiums in a business or profit-oriented or other context that would otherwise be deductible. The following cases demonstrate that any such sweeping rule would be erroneous: *Carmichael v. Commissioner*, 14 T.C. 1356, 1362–1365 (1950); *Hunton, IV v. Commissioner*, 1 T.C. 821 (1943); *Behrend v. Commissioner*, 23 B.T.A. 1037 (1931).

Although there is superficial support for the Government's position based upon an uncritically literal reading of the regulations, we think it is unsound as applied in this case. We do not construe the regulations as prohibiting the deduction of life insurance premiums by the insured under *all* circumstances. A reasonable interpretation of the regulations compatible with the purpose of the statute would not foreclose the deduction of such premiums where the payments are occasioned by, and are proximately related to, the insured's business (section 162) or profit-oriented (section 212(2)) affairs.

3. *Section 264(a)(1).*—The Commissioner argues finally that the claimed deductions are prohibited by section 264(a)(1), which provides:

SEC. 264. CERTAIN AMOUNTS PAID IN CONNECTION WITH INSURANCE CONTRACTS.

(a) GENERAL RULE.—No deduction shall be allowed for—

(1) Premiums paid on any life insurance policy covering the life of any officer or employee, or of any person financially interested in any trade or business carried on by the taxpayer, when the taxpayer is directly or indirectly a beneficiary under such policy.

Petitioners' principal response is that the business of BCA was not "carried on" by Carbine; that section 264(a)(1) is concerned only with trade or business deductions allowed under section 162, and that the claimed deductions were of a nonbusiness character authorized by section 212(2)—deductions that are unaffected by section 264(a)(1). In our judgment, the matter has been adjudicated against petitioners by *Meyer v. United States*, 175 F.2d 45 (2d Cir. 1949).

In *Meyer* the court had occasion to consider the impact of section 24(a)(4) of the 1939 Code (identical with section 264(a)(1) of the 1954 Code involved herein) upon deductions claimed under section 23(a)(2) of the 1939 Code (the relevant portions of which were identical with the relevant portions of section 212(2) of the 1954 Code involved herein). Based upon a finding of the District Court, the Court of Appeals addressed the issue on the assumption that the claimed deductions for payments of life insurance premiums were otherwise allowable under section 23(a)(2) as nonbusiness deductions, and concluded that they were foreclosed by section 24(a)(4). In reaching that result, the Second Circuit carefully examined the origin and scope of section 23(a)(2). It pointed out that

section 23(a)(2) was added to the Code in 1942 in order to provide relief for individual taxpayers in respect of nonbusiness ordinary and necessary expenses incurred for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income—deductions similar to those which had theretofore been available under section 23(a) to only those individuals who were engaged in carrying on a trade or business. Citing *Trust of Bingham v. Commissioner*, 325 U.S. 365 (1945), the Circuit Court noted that the old and new provisions were in pari materia,[7] that the words "ordinary and necessary" had already acquired a special meaning in respect of business expenses that was applicable to the new class of nonbusiness deductions. It held in substance that the new provisions relating to nonbusiness expenses were governed by the same rules, limitations, and restrictions applicable to business expenses, subject only to the condition that a particular expense be one that is described in the statute. That conclusion was fully supported by the legislative history, for, in reporting the Revenue Bill of 1942, the House Ways and Means Committee stated (H. Rept. 2333, 77th Cong., 2d Sess. 75 (1942)):

A deduction under this section [23(a)(2)] is subject, except for the requirement of being incurred in connection with a trade or business, to all the restrictions and limitations that apply in the case of the deduction under section 23(a)(1)(A) of an expense paid or incurred in carrying on any trade or business. * * *

See also S. Rept. 1631, 77th Cong., 2d Sess. 88 (1942).

In holding that the deductibility of the nonbusiness expenses was subject to the same restrictions as those applicable to business expenses, and particularly to those relating to life insurance premiums contained in section 24(a)(4), the Circuit Court stated (175 F. 2d at 47):

---

[7]In this connection, the Supreme Court had stated in *Trust of Bingham v. Commissioner*, 325 U.S. 365, 374 (1945):

"The effect of sec. 23(a)(2) was to provide for a class of non-business deductions coextensive with the business deductions allowed by sec. 23(a)(1), except for the fact that, since they were not incurred in connection with a business, the section made it necessary that they be incurred for the production of income or in the management or conservation of property held for the production of income. * * *"

we think it plain enough that Congress intended to impose like restrictions upon the deduction of expenses paid or incurred for life insurance by individual taxpayers not in trade or business. * * *

We think that *Meyer* is dispositive of the issue before us. Petitioners do not challenge *Meyer* as a correct statement of the law under the 1939 Code, but they argue that a like result is not called for under the 1954 Code, where the newly designated sections 212(2) and 264(a)(1) were simultaneously embodied in the 1954 codification. We do not agree.

Not a shred of persuasive evidence—such as an explicit statement in a committee report or otherwise—has been called to our attention that would support the view that these provisions were intended to have any meaning in the 1954 Code that differed from preexisting law. Section 264(a)(1) is identical, word for word, with its predecessor, section 24(a)(4) of the 1939 Code, and section 212(2) is identical with the old corresponding language of section 23(a)(2). We know of no express indication by Congress that it intended the recodification to impart a different meaning to such provisions, and we hold that the mere recodification in 1954 in these circumstances did not effect any change in their operative scope.[8]

There remains for consideration merely whether Carbine was "directly or indirectly" a beneficiary under the policy as required by section 264(a)(1). He certainly was not a direct beneficiary, but we hold that he was "indirectly" a beneficiary. The point is not a novel one. There have been a number of cases in which a creditor was the named (sole or primary) beneficiary or assignee of a policy on the taxpayer's life. And it has been uniformly held that the taxpayer was an indirect beneficiary regardless of whether his potential liability to the creditor was that of a primary obligor or a guarantor (*D'Angelo Associates, Inc. v. Commissioner*, 70 T.C. 121, 137 (1978)) and regardless of whether the taxpayer's estate was named as a residuary beneficiary (*Rodney v. Commissioner*, 53 T.C. 287, 318 (1969)). See also *Glassner v. Commissioner*, 43 T.C. 713 (1965), affd. 360 F.2d 33 (3d Cir.), cert. denied 385 U.S. 819 (1966); *Jefferson v. Helvering*, 121 F.2d 16 (D.C. Cir. 1941), affg. 40 B.T.A. 274 (1939); *Klein v. Commissioner*, 84 F.2d 310

---

[8]The *Meyer* case has been regarded as applicable to the recodified provisions in the 1954 Code, without any suggestion that there might even be a question in this regard. See 1 B. Bittker, Federal Taxation of Income, Estates, and Gifts, par. 12.5.1, at 12–40 n. 12 (1981).

(7th Cir. 1936), affg. 31 B.T.A. 910 (1934); *Philips v. Commissioner,* 24 B.T.A. 98 (1931); *Barron v. Commissioner,* 14 B.T.A. 1022 (1929); *Parker v. Commissioner,* 13 B.T.A. 115 (1928).

Section 264(a)(1) is an insuperable impediment to the deductions claimed by petitioners. Indeed, a contrary result would be basically inconsistent with the very underlying contention made by petitioners to support their position that the payments qualified for deduction under section 212(2) in the first place. If the payment of premiums was proximately related to the protection of Carbine's securities so as to satisfy the requirements of section 212(2), it was only because he stood to benefit therefrom. He must therefore be classified as an indirect beneficiary. Petitioners cannot have it both ways.

Because of concessions,

*Decision will be entered under Rule 155.*