T.C. Summary Opinion 2012-102

UNITED STATES TAX COURT

FUHUA CHENG AND SUE Y. CHENG, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9847-11S.                    Filed October 22, 2012.

Fuhua Cheng, pro se.

Kristin M. Bourland, for respondent.

SUMMARY OPINION

CHIECHI, Judge:  This case was heard pursuant to the provisions of section

7463 of the Internal Revenue Code in effect when the petition was filed.[1]  Pursuant

---

[1]Hereinafter, all section references are to the Internal Revenue Code (Code) in effect for the years at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

Respondent determined deficiencies of $4,065 and $4,365 in petitioners' Federal income tax (tax) for their taxable years 2007 and 2008, respectively.

We must decide whether petitioners are entitled to deduct under section 212(2) or 162(a) certain claimed expenses of $27,070.30 and $29,099.80 for their taxable years 2007 and 2008, respectively. We hold that they are not.

## Background

Petitioner Fuhua Cheng (Mr. Cheng) and respondent stipulated some of the facts in this case, and those facts are so found.[2]

At the time petitioners filed the petition, they resided in Kentucky.

During 2007 and 2008, Ms. Cheng was a housewife, and Mr. Cheng worked as a professor of computer science for the University of Kentucky (UKY). During those years, Mr. Cheng received wage income from UKY of $115,450.44 and $122,190.90, respectively.

---

[2]Petitioner Sue Y. Cheng (Ms. Cheng) did not sign the stipulation of facts between Mr. Cheng and respondent. Nor did she appear at the trial in this case. Respondent filed a motion to dismiss for lack of prosecution as to Ms. Cheng. We shall grant that motion and shall enter a decision with respect to Ms. Cheng that is the same as the decision that we shall enter with respect to Mr. Cheng.

In 1993, Mr. Cheng began operating Amchael Graphics (Amchael), a sole proprietorship through which he conducted software development, consulting, and import and export businesses.[3]  Sometime thereafter in 1993, Amchael entered into a joint venture with Qingdao Laoshan Foreign Trade Freeze-Storage Plant (Plant), a company owned by the People's Republic of China (China), in order to "combine [the Plant's] many years experience in food processing and [Amchael's] strength in marketing and information technology to process seafood for international market and generate satisfactory financial returns to both parties."  To that end, on September 15, 1993, Amchael and the Plant formed Qingdao Fuhua Aquatic Foodstuff Co., Ltd. (Company), in the Laoshan District of Qingdao City, China, to process and sell seafood, meat, and frozen vegetables.

Amchael and the Plant contributed a total of $600,000 of capital to the Company; Amchael invested cash of $150,000, or 25 percent of the total capital of the Company, and the Plant's investment consisted of a plant and equipment valued at $450,000, or 75 percent of the total capital of the Company.  In exchange for their capital contributions, Amchael and the Plant received 25-percent and 75-percent ownership interests, respectively, in the Company.

---

[3]Certain portions of the record and Mr. Cheng at trial and on brief refer interchangeably to Amchael and Mr. Cheng.  For convenience, we shall do the same.

Pursuant to the contract governing the joint venture between Amchael and the Plant (joint venture agreement), the Company was to remain in existence for 12 years, but it was possible to extend the period of its existence.

According to the joint venture agreement, Amchael's responsibilities included providing marketing information to the Company, finding customers for the Company in the international market, and working on other matters that the Company requested. The joint venture agreement also authorized the Company to name Amchael as its agent in selling its products.

According to the joint venture agreement, the Plant's responsibilities included submitting application materials to the Chinese Government, obtaining an operating license for the Company, applying for and obtaining ownership of the land on which the Company was to operate, renting manufacturing equipment from the Chinese Government, arranging paperwork for importing and shipping the equipment needed to operate the Company, assisting the Company in finding management and personnel, and working on other matters that the Company requested.

A board of trustees (Company board) consisting of five members was the highest authority of the Company and was responsible for making decisions on its behalf. An individual known as a general manager, who was recommended by the

Plant and who reported to the Company board, managed the daily operations of the Company.  Neither Mr. Cheng nor his sole proprietorship Amchael managed the Company, and neither Amchael nor the Plant was allowed to transfer its interest in the Company without the unanimous approval of the Company board.  If Amchael or the Plant made the operation of the Company impossible, the other person had the right to request that the violating party terminate the joint venture agreement.

The joint venture agreement provided that the Company was to make the following payments to Amchael over the initial 12-year period of its existence: $37,000 during the first year of operation, $35,000 during the second year of operation, $34,000 during the third year of operation, $33,000 during the fourth year of operation, $31,000 during the fifth year of operation, and 5 percent of the profits during each year of operation six through twelve.[4]

By June 1997, because of mismanagement and Chinese Government foreign trade policy reform, the Plant had accumulated operating losses of approximately $1,744,855 and debt of approximately $3,790,613.70.  That large debt and lack of capital caused the Plant to begin experiencing difficulty in continuing its operations.

---

[4]The record does not establish whether the Company made any of the annual payments to Amchael that the joint venture agreement required.

By May 1998, the Plant was in nonproduction status. Although the financial condition of the Plant in 1998 would have warranted its declaring bankruptcy and seeking to reorganize its operations, Chinese law would not have permitted it to do so.

In December 1997, the capital in the Company was reevaluated. Thereafter, Amchael's initial $150,000 investment in the Company was reduced to $90,000, and the Plant's investment therein was reduced to $270,000.[5]

At a time not specifically established by the record after June 1997 and before May 18, 1998, a plan (transfer plan) was developed under which the Plant was to divest itself of its ownership interest in the Company. Under the transfer plan (1) "employees and management" of the Company were to make capital contributions to form a "Chinese Stock Holding Association" (stockholding association), (2) that stockholding association was to form Qingdao Sheng-hua Aquatic Foodstuff Freeze-Storage Plant (New Plant), and (3) the Plant was to transfer its ownership interest in the Company to the New Plant.

On May 18, 1998, the Company board held a meeting to discuss, inter alia, the transfer plan and the potential impact of that plan on the Company. At that

---

[5]The record does not establish how the respective reductions of Amchael's and the Plant's investments in the Company were accomplished.

meeting, which Mr. Cheng attended, the Company board adopted resolutions (1) that Mr. Cheng was not to withdraw from the Company his $90,000 investment therein and (2) that all issues regarding the transfer of the Plant's ownership interest in the Company were to be reported to and discussed with Mr. Cheng.

On July 9, 1998, the Plant's parent company, Qingdao City Laoshan Import-Export Head Company (Head Company), submitted to the Licang District Foreign Trade and Economic Committee (Licang Economic Committee) a request to transfer to the New Plant pursuant to the transfer plan the Plant's 75-percent ownership interest in the Company.[6] On July 16, 1998, the Head Company submitted to the Licang District Government a request to effect the transfer plan.[7] On a date not established by the record, the Chinese Government approved the transfer plan.[8]

In July 1998, when the total assets of the Company were valued at $586,040.91 and its debt totaled $577,617.32, the transfer plan was effected by

---

[6]The record does not establish when the Licang Economic Committee granted the Head Company permission to transfer the Plant's interest in the Company to the New Plant.

[7]The record does not establish when the Licang District Government granted the Head Company's request to effect the transfer plan.

[8]The record does not establish (1) the date on which the transfer plan was approved and (2) what Chinese Governmental agency approved the transfer plan.

using a method known as a "buy-out by inheriting debt".[9]  Under Chinese law, a "buy-out by inheriting debt" is permitted when the value of the assets of an enterprise is approximately equal to its debt.  Such a buyout results in a purchaser's "taking over" the assets of an enterprise by "assuming" its debt under certain Chinese regulations.[10]

After the transfer plan was effected in July 1998, the Company had the following options for satisfying its then-existing debt:[11]  (1) use the investment money from the stockholding association to repay the debt, (2) attempt to reach an installment agreement with the Company's creditors, or (3) use the investment money from the stockholding association as a circulating fund to develop business and pay the debt with profits.

Petitioners filed joint tax returns for their taxable years 2007 (2007 return) and 2008 (2008 return).  Petitioners attached Schedule C, Profit or Loss From Business (Schedule C), for Amchael to each of the 2007 return (2007 Schedule C)

---

[9]The record does not establish the specific steps and procedures under which the "buy-out by inheriting debt" transfer of the Plant's interest in the Company to the New Plant was effected.

[10]The record does not establish what the stipulated terms "taking over" and "assuming" mean in the context of a "buy-out by inheriting debt".

[11]The record does not establish the amount of debt that the Company had after the transfer plan was effected.

and the 2008 return (2008 Schedule C).  In the 2007 Schedule C, petitioners claimed certain expenses of $27,070.30 (2007 claimed debt expense), which petitioners described in that schedule as "Debt payment * * * to Qingdao Fuhua Aquatic Foodstuff Co., Ltd, Dong Licun, Licang District, Qingdao, China".  In the 2008 Schedule C, petitioners claimed certain expenses of $29,099.80 (2008 claimed debt expense), which petitioners described in that schedule as "Debt payment * * * to Qingdao Fuhua Aquatic Foodstuff Co., Ltd, Dong Licun, Licang District, Qingdao, China".

Respondent issued to petitioners a notice of deficiency (notice) with respect to their taxable years 2007 and 2008.  In the notice, respondent determined to disallow the 2007 claimed debt expense of $27,070.30 and the 2008 claimed debt expense of $29,099.80.

## Discussion

Mr. Cheng bears the burden of establishing that the determinations in the notice are erroneous.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Moreover, deductions are a matter of legislative grace, and Mr. Cheng bears the burden of proving entitlement to any deduction claimed.  See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).  The Code and the regulations

thereunder required Mr. Cheng to maintain records sufficient to establish the amount of any deduction claimed. See sec. 6001; sec. 1.6001-1(a), Income Tax Regs.

At trial, Mr. Cheng was the only witness. We found Mr. Cheng's testimony to be in certain material respects vague, self-serving, and/or uncorroborated. We shall not rely on the testimony of Mr. Cheng to establish his position with respect to the issue presented. See, e.g., Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

It was petitioners' position in the petition that they are entitled for their taxable years 2007 and 2008, respectively, to deduct under section 212(2) or 162(a) the 2007 claimed debt expense of $27,070.30 and the 2008 claimed debt expense of $29,099.80. On brief, Mr. Cheng takes the position that petitioners are entitled to deduct those claimed debt expenses only under section 212(2). Because it is not altogether clear whether Mr. Cheng is no longer relying on section 162(a) to support his position with respect to the 2007 claimed debt expense and the 2008 claimed debt expense, we shall consider Mr. Cheng's claimed entitlement to those claimed debt expense deductions under both sections 212(2) and 162(a). We

shall first summarize briefly the respective requirements of sections 212(2) and 162(a).[12]

Section 212(2) allows a deduction for all the ordinary and necessary expenses paid or incurred during the taxable year for the management, conservation, or maintenance of property held for the production of income.[13]  The determination of whether an expenditure satisfies the requirements for deductibility under that section is a question of fact.  See Gunn v. Commissioner, 49 T.C. 38, 52 (1967).

Section 162(a) generally allows a deduction for all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business.  The determination of whether an expenditure satisfies the requirements for deductibility under that section is a question of fact.  See Commissioner v. Heininger, 320 U.S. 467, 475 (1943).

In general, for purposes of sections 212(2) and 162(a), an expense is ordinary if it is considered normal, usual, or customary for the management, conservation, or

---

[12]We address sec. 212(2) before we consider sec. 162(a) because Mr. Cheng relies on that section in his brief, the last document that he filed in this case.

[13]Expenses deductible under sec. 212 are "miscellaneous itemized deductions".  See sec. 67(b).  As such, they are allowed as deductions only to the extent that they exceed 2 percent of the taxpayer's adjusted gross income.  See sec. 67(a).

maintenance of property held for the production of income under section 212(2) or in carrying on a trade or business under section 162(a). See Deputy v. du Pont, 308 U.S. 488, 495-496 (1940); Carbine v. Commissioner, 83 T.C. 356, 362-363 (1984), aff'd, 777 F.2d 662 (11th Cir. 1985). Generally, for purposes of sections 212(2) and 162(a), a taxpayer's payment of the debt of another taxpayer is not an ordinary expense of the payor-taxpayer that is deductible under those sections. See Welch v. Helvering, 290 U.S. at 113-115; Carbine v. Commissioner, supra.

In general, for purposes of sections 212(2) and 162(a), an expense is necessary if it is appropriate and helpful for the management, conservation, or maintenance of property held for the production of income under section 212(2) or in carrying on a trade or business under section 162(a). See Commissioner v. Tellier, 383 U.S. 687, 689 (1966); Carbine v. Commissioner, supra at 363. Generally, for purposes of sections 212(2) and 162(a), a taxpayer's payment of the debt of another taxpayer is not a necessary expense of the payor-taxpayer that is deductible under those sections. See Welch v. Helvering, supra; Grauman v. Commissioner, 357 F.2d 504, 505 (9th Cir. 1966), aff'g T.C. Memo. 1964-226.

Where a taxpayer pays the obligation of another taxpayer with the primary motive of managing, conserving, or maintaining property of the payor-taxpayer

held for the production of income or promoting or protecting a trade or business of the payor-taxpayer, that payment is deductible by the payor-taxpayer under section 212(2) or section 162(a), provided that that payment of that other taxpayer's obligation is an ordinary and necessary expense within the meaning of section 212(2) for the management, conservation, or maintenance of property of the payor-taxpayer held for the production of income, see Carbine v. Commissioner, 83 T.C. at 362-363, or within the meaning of section 162(a) in carrying on a trade or business of the payor-taxpayer, see Lohrke v. Commissioner, 48 T.C. 679, 684-685 (1967).

We turn now to petitioner's position that he is entitled to deduct the 2007 claimed debt expense and the 2008 claimed debt expense for petitioners' taxable years 2007 and 2008, respectively. In order to be entitled under section 212(2) or 162(a) to those claimed debt expense deductions, Mr. Cheng must establish, inter alia, that he paid or incurred during petitioners' taxable years 2007 and 2008 those respective claimed debt expenses. It is Mr. Cheng's position that he satisfies that requirement because pursuant to the transfer plan he, as a 25-percent owner of the Company, "assumed" 25 percent of the Company's debt, including debt of the Plant that Mr. Cheng claims the Company "assumed", and obligated himself to pay that

25 percent of the Company's debt that he "assumed" by making an annual payment to the Company of ¥200,000.[14]

We find no reliable evidence in the record establishing Mr. Cheng's position that pursuant to the transfer plan (1) he, as a 25-percent owner of the Company, "assumed" 25 percent of the Company's debt, including debt of the Plant that Mr. Cheng claims the Company "assumed", and (2) he obligated himself to pay that 25 percent of the Company's debt that he claims he "assumed" by making an annual payment to the Company of ¥200,000.

Assuming arguendo that we had found reliable evidence in the record to establish the underlying factual premises (discussed above) of Mr. Cheng's position, we turn to his argument that "As long as petitioners can manage to pay the debt installment and get credit for it * * * it does not matter if the money is sent by the petitioners directly."

---

[14]As we understand it, Mr. Cheng is not arguing that when he claims that he "assumed" 25 percent of the Company's debt pursuant to the transfer plan he agreed to be responsible directly to the Company's creditors to pay 25 percent of that debt.

Respondent does not dispute, and thus we assume, that, because of foreign currency exchange fluctuations, ¥200,000 was equal to $27,070.30 in 2007 and $29,099.80 in 2008.

In support of his argument that he satisfied his claimed annual obligation to pay ¥200,000 to the Company "with borrowed funds", Mr. Cheng contends that he entered into an oral agreement (purported loan agreement) with his sister and her spouse under which they lent him ¥200,000 in each of the years 2007 and 2008 by making a payment of ¥200,000 in each of those years to the Company on Mr. Cheng's behalf.[15]  Mr. Cheng maintains that pursuant to the purported loan agreement he is required to repay, with interest, the ¥200,000 that he claims his sister and her spouse lent him in each of the years 2007 and 2008 from profits of the Company that he will receive as a 25-percent owner of the Company.

We find no reliable evidence in the record establishing that in each of the years 2007 and 2008 the payment of ¥200,000 that respondent does not dispute, and we thus assume, see supra note 15, Mr. Cheng's sister and her spouse made to the Company was a payment that they made on behalf of Mr. Cheng.  On the record before us, we reject Mr. Cheng's contention that he entered into an oral agreement with his sister and her spouse under which they lent him ¥200,000 in

---

[15]On brief, respondent states:  "Based upon the record, it appears that [Mr. Cheng's sister and her spouse] not only supplied the funds but actually made the payments at issue."  It appears that respondent does not dispute, and thus we assume, that Mr. Cheng's sister and her spouse made a payment to the Company of ¥200,000 in each of the years 2007 and 2008.

each of the years 2007 and 2008 by making a payment of ¥200,000 in each of those years to the Company on Mr. Cheng's behalf.[16]

On the record before us, we find that Mr. Cheng has failed to carry his burden of establishing that he paid or incurred during petitioners' taxable years 2007 and 2008, respectively, the 2007 claimed debt expense and the 2008 claimed debt expense.

Based upon our examination of the entire record before us, we find that Mr. Cheng has failed to carry his burden of establishing that petitioners are entitled under section 212(2) or 162(a) to deduct the 2007 claimed debt expense of $27,070.30 and the 2008 claimed debt expense of $29,099.80.[17]

---

[16]Moreover, a purported loan between family members, like the purported loan that Mr. Cheng claims his sister and her spouse made to him in each of the years 2007 and 2008, would be subject to close scrutiny. See Perry v. Commissioner, 92 T.C. 470, 481 (1989), aff'd without published opinion, 912 F.2d 1466 (5th Cir. 1990). Mr. Cheng acknowledged at trial that there are no (1) written agreement between him and Mr. Cheng's sister and her spouse requiring repayment of the alleged loans, (2) fixed repayment schedule for the alleged loans, (3) fixed rate of interest charged on the alleged loans, and (4) consequences to Mr. Cheng if he were to fail to repay the alleged loans.

[17]Assuming arguendo that Mr. Cheng had carried his burden of establishing that he paid or incurred during petitioners' taxable years 2007 and 2008, respectively, the 2007 claimed debt expense and the 2008 claimed debt expense, Mr. Cheng would nonetheless be required to establish that those expenses are ordinary and necessary expenses (1) within the meaning of sec. 212(2) that he paid or incurred in managing, conserving, or maintaining his interest in the Company or

(continued...)

We have considered all of petitioners' contentions and arguments that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing,

<u>An order granting respondent's motion to dismiss for lack of prosecution as to petitioner Sue Y. Cheng and decision for respondent will be entered</u>.

---

[17](...continued)
(2) within the meaning of sec. 162(a) that he paid or incurred in carrying on his business, Amchael. The parties stipulated that "Petitioner Fuhua Cheng claims to have assumed twenty-five percent of the debt [of the Company] in order to protect his investment in the [C]ompany and prevent the Chinese banks from assuming ownership of the [C]ompany." On the record before us, assuming arguendo that Mr. Cheng had carried his burden of establishing that he paid or incurred during petitioners' taxable years 2007 and 2008, respectively, the 2007 claimed debt expense and the 2008 claimed debt expense and that he paid or incurred those claimed debt expenses for the purpose of protecting his investment in the Company and preventing the Chinese banks from assuming ownership thereof, on the record before us, we find that Mr. Cheng has failed to carry his burden of establishing that those claimed debt expenses are ordinary and necessary expenses (1) within the meaning of sec. 212(2) that he paid or incurred in managing, conserving, or maintaining his interest in the Company or (2) within the meaning of sec. 162(a) that he paid or incurred in carrying on his business, Amchael. If we were to accept all of the foregoing assumptions as facts, it appears to us that Mr. Cheng did nothing more in 2007 and 2008 than make an additional capital con-tribution to the Company in order to protect the investment that he had already made in that Company.