CAROLYN PRATT PERRY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6507-83, 14905-84,     Filed March 16, 1989.
15225-84.

Carolyn Pratt Perry, pro se.
*Janice Chenier Taylor,* for the respondent.

CHABOT, *Judge:* Respondent determined deficiencies in Federal individual income tax and additions to tax under

section 6651(a)(1)[1] (failure to file timely tax returns) against petitioner as follows:

|  |  |  | Additions to tax |
| Docket No. | Year | Deficiency | sec. 6651(a)(1) |
| 6507-83 | 1980 | $433 | - - - |
| 14905-84 | 1981 | 1,349 | - - - |
| 15225-84 | 1982 | 2,477 | [2]$362.25 |

By amendment to answer, respondent asserts an increased deficiency for 1980 in the amount of $539.58, for a total deficiency in the amount of $972.58. This is based on disallowance of a deduction of $3,000 and is disputed. At trial, respondent also asserted that petitioner had a 1980 long-term capital gain of $156 that had not been taken into account; petitioner concedes the correctness of this additional adjustment.

These cases have been consolidated for trial, briefs, and opinion. After concessions by both parties, the issues for decision[3] are as follows:

(1) Whether petitioner was entitled to bad debt deductions under section 166 on account of arrearages in payments due from her ex-husband;

(2) Whether petitioner was entitled to a child care credit on account of transportation expenses paid for her children; and

(3) Whether petitioner was entitled to a child care credit on account of her payment of the employee's share of social security taxes on behalf of a babysitter.

### FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

When the petitions were filed in the instant cases, petitioner resided in Baton Rouge, Louisiana.

Petitioner married Richard Donald James Perry (hereinafter sometimes referred to as Perry) on November 26, 1966.

---

[1]Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the years in issue.

[2]Respondent has conceded the sec. 6651(a)(1) addition to tax.

[3]The adjustments to medical expense deductions are derivative, and depend on the settled issues and on our determination as to the bad debt deductions.

At that time, petitioner was a chemist at Union Carbide Corp. in Tarrytown, New York; Perry was a marketing assistant manager for the Nestle Co., and attended night school.

In January 1967, Perry quit his job and became a full-time student at Iona College in New Rochelle, New York. Perry continued as a full-time student until he was graduated in June 1969, receiving a bachelor's degree in business administration. While Perry pursued his degree, petitioner continued working. During those 2½ years, petitioner spent about $10,000 for books, tuition, and other expenses allocable to Perry.

In mid-1969, Perry entered the Army. Petitioner's and Perry's first child, Elizabeth (hereinafter sometimes referred to as Beth), was born on April 28, 1970. Perry then served a tour in Vietnam. On his return, he, petitioner, and Beth moved to Atlanta, Georgia, where he became a marketing manager for Mead Corp. Their second child, Leonard (hereinafter sometimes referred to as Tad), was born on May 18, 1972.

Petitioner and Perry were divorced on June 23, 1975, by judgment of the Superior Court of Fulton County, Georgia. The Georgia court's divorce decree (hereinafter sometimes referred to as the divorce decree) incorporated a property settlement and support agreement between petitioner and Perry. The divorce decree granted custody of their minor children to petitioner.

*Bad Debt Deduction*

In paragraph 2 of the divorce decree[4], Perry was ordered

---

[4]

2.

To settle and discharge the husband's legal obligations to the children by reason of their marital status and family relationship, the husband shall make the following payments to the wife for the support, care, maintenance and education of the children:

(a) For the period commencing May 1, 1975, and continuing thereafter until said child marries, becomes eighteen (18) years of age, becomes self-supporting or dies, whichever event first occurs, the sum of Two Hundred Dollars ($200.00) per month for the support, care, maintenance and education of ELIZABETH PRATT PERRY, provided, however, that notwithstanding the above provision said support shall continue for said child so long as she remains as a fulltime student in a four-year baccalaureate degree granting program;

(b) For the period commencing May 1, 1975, and continuing thereafter until said child marries, becomes eighteen (18) years of age, becomes self-supporting or dies, whichever event first occurs, the sum of Two Hundred Dollars ($200.00) per month for the support, care,

to pay to petitioner a total of $400 per month ($200 for each child) "for the support, care, maintenance and education of the children". (The payments so ordered are hereinafter sometimes referred to as paragraph 2 payments.) In paragraph 3 of the divorce decree[5], Perry was ordered to pay an additional amount of up to $400 per month, depending on the level of Perry's net income, as "alimony for [petitioner's] proper support and maintenance". (The payments so ordered are hereinafter sometimes referred to as paragraph 3 payments.)[6]

Paragraphs 11 and 12 of the divorce decree provide as follows:

## 11.

The husband, so long as he makes the payments herein called for to the wife for her support and that of the children as the same fall due, and complies with his other obligations hereunder, he shall have the sole and exclusive right to claim the said children as his dependents for federal and state income tax purposes.

---

maintenance and education of LEONARD KEEGAN PERRY, provided, however, that notwithstanding the above provision said support shall continue for said child so long as he remains as a fulltime student in a four-year baccalaureate degree granting program.

All of the aforesaid payments shall be made by the fifth (5th) day of each month beginning in the month stated and continuing each successive month as provided in the above terms of payment, subject to the adjustments set forth below, but shall cease and terminate in the event of the husband's death.

5

### 3.

In addition to the payments to the wife for child support designated in paragraph two, the Husband shall make the following payments to the wife as alimony, for her proper support and maintenance, until she dies, until she remarries, until the husband dies or until May 1, 1991, whichever first occurs (provided, however, that the remarriage of the wife shall not terminate such alimony so long as a child remains under the age of 18):

(a) In the event the husband shall realize in any one month a net income in excess of One Thousand Dollars ($1,000.00), to include any salary, wages, commissions, bonuses, and the like, reduced by the amount of F.I.C.A., federal and state taxes with-held (or an appropriate pro rata withholding for estimated tax payments) the husband shall pay Forty (40%) Percent of such excess, subject to a maximum amount of Four Hundred Dollars ($400.00) per month.

(b) In connection with the husband's performance of the obligations set forth above, the husband shall make available to the wife for her inspection copies of any original statements prepared by the husband's employer reflecting the husband's income for the preceding calendar quarter beginning June 1, 1975, and the husband shall also make available to the wife for her inspection no later than March 15th of each year beginning March 15, 1976, copies of any and all "W-2" forms reflecting yearly income.

[6]Respondent has conceded (for purposes of this proceeding only) that Perry's income was of a sufficient amount that Perry would have been required to pay $400 per month to petitioner as paragraph 3 payments during 1980, 1981, and 1982.

## 12.

This Agreement is intended to provide for the full future obligations as between the parties hereto based on the present income and financial condition of the husband and the wife, and neither party hereto shall be barred from seeking a revision of the same under the provisions of Georgia Code Annotated sec. 30-220, *et seq.* This Agreement constitutes the entire understanding between the parties, and there are no representations or warranties other than expressly herein set forth. Except as provided herein, no modification or waiver of any of the terms hereof shall be valid unless in writing and signed by both parties. No waiver of any breach hereof or default hereunder shall be deemed a waiver of any subsequent breach or default of a same or similar nature.

In June of 1976, Perry informed petitioner that he would not make any of the payments he owed to petitioner under the divorce decree. At that time, petitioner was unemployed and attending school. Petitioner then began a long series of enforcement efforts. Petitioner had a complaint filed under the Uniform Reciprocal Enforcement of Support Act[7]. As a result, beginning in August of 1976, Perry began making payments of $250 per month. In February of 1977, Perry filed suit in Louisiana Family Court to have the $800-per-month payments required under the divorce decree (paragraph 2 payments plus paragraph 3 payments) reduced. Petitioner, by reconventional demand, asked the Louisiana court to award her $14,000 for payments ($4,800 of "child support" and $9,200 of "alimony") in arrears from Perry as of April 1, 1977. On May 23, 1978, the Louisiana court ordered Richard to pay to petitioner $6,450 "for child support as stipulated due." The Louisiana court's judgment did not refer to (1) Perry's contention that his payment obligations should be reduced and (2) petitioner's reconventional demand for $9,200 of "alimony". The Louisiana court's judgment did "recognize and render executory" in Louisiana, the divorce decree that had been issued by the Georgia court.

In 1979, petitioner obtained a writ of fieri facias[8] from the Georgia court for $9,442.50 of arrearages in paragraph 2

---

[7]The Uniform Reciprocal Enforcement of Support Act provides a procedure through which the custodial parent can gain interstate enforcement of child support. Ga. Code Ann. secs. 19-11-40 through 19-11-81 (1982); La. Rev. Stat. Ann. sec. 13:1661-1698 (West 1983).

[8]Under Georgia law, there is a procedure under which the court will issue a writ of fieri facias based on an affidavit by the custodial parent, for amounts due under an existing agreement for child support. Ga. Code Ann. sec. 19-6-4 (1982).

payments due to that date. In 1985, she obtained another writ of fieri facias for $7,408 of arrearages in paragraph 2 payments due from 1979 through 1985. She did not seek writs of fieri facias for the arrearages in paragraph 3 payments because, pursuant to advice of legal counsel, she believed that the fieri facias procedures were not available for the collection of payments labeled as alimony.

By the spring of 1985, Perry had become up-to-date in his paragraph 2 payments obligations. However, Perry has not made any paragraph 3 payments.

On her tax returns for 1980, 1981, and 1982, petitioner claimed dependency deductions for both Beth and Tad; respondent has not disallowed any of these dependency deductions.

On her 1980, 1981, and 1982 Federal income tax returns, petitioner claimed above-the-line deductions in the amounts of $3,000[9], $4,800[10], and $4,800[11], respectively, on account of the arrearages in paragraph 3 payments for those years. For 1982, petitioner reported an adjusted gross income of $29,607.

During each of the years 1980, 1981, and 1982, petitioner spent from her own funds more to support Beth and more to support Tad than she received from Perry for each of these children.

The petitions in the instant consolidated cases were filed on March 24, 1983, May 21, 1984, and May 23, 1984. On September 30, 1985, petitioner executed a document titled: "Continuing Guarantee and Agreement to Pay Support Obligations of Richard D. Perry" (hereinafter sometimes

[9]On her 1980 tax return, petitioner inadvertently omitted her Schedule D. On the Schedule D which she had prepared but failed to attach to the Form 1040, petitioner claimed a short-term capital loss of $4,800 (nonbusiness bad debt from the paragraph 3 payments arrearages for 1980) and reported a long-term capital gain of $156 (unrelated matter). On that Schedule D, petitioner netted the two items, but arrived at a loss of $4,643. Applying the deduction limit (sec. 1211(b)), she deducted $3,000 in arriving at adjusted gross income for 1980 and showed $1,643 as available for short-term capital loss carryover treatment for 1981.

[10]On her 1981 tax return, petitioner properly attached her Schedule D. The only item on this schedule was the $4,800 short-term capital loss deduction. Petitioner ignored the $1,643 carryover from 1980. More to the point, she failed to fill out Part III of Schedule D, ignored the $3,000 deduction limit, and deducted $4,800 in arriving at adjusted gross income.

[11]On her 1982 tax return, petitioner properly attached her Schedule D. Here, too, the only item was the $4,800 short-term capital loss deduction. Again, petitioner ignored carryovers. This time, petitioner filled out part of Part III of Schedule D, but stopped before the last line of that part and so she once again ignored the $3000 deduction limit. Again, she deducted $4,800 in arriving at adjusted gross income.

referred to as the guarantee)[12] under which petitioner purported to guarantee payment to Beth and Tad of the payments due from Perry under the divorce decree. The guarantee was to be retroactive to June 23, 1975.

## Child Care Credit

During 1980 through 1982, petitioner was employed as an attorney on a full-time basis. Beth and Tad came home from school about 3 p.m., and petitioner did not usually get home from work until about 7 p.m. Because of her employment, petitioner found it necessary to secure day-care services for Beth and Tad. Among the babysitters petitioner hired for Beth and Tad's day-care was Verna Crawford (hereinafter sometimes referred to as Crawford).

Petitioner paid Crawford about $3 an hour, and also agreed to pay Crawford's share of social security taxes as part of Crawford's compensation for babysitting. During

---

[12]

Continuing Guarantee and Agreement to Pay
Support Obligations of Richard D. Perry

In consideration of the fact that Richard D. Perry (Debtor) is obligated to pay certain sums each year on a monthly basis up to a maximum amount of $800.00/month or $7200.00/year [sic] under that certain property settlement and support agreement entered into and made a part of the Judgment of Divorce rendered on June 23, 1975, in Fulton Superior Court, Georgia, a copy of which is attached hereto and incorporated herein as Exhibit "A";

Further, in consideration of the fact that it was my understanding of the agreement at that time, as well as now, that said sums were to be paid to me, Carolyn Pratt Perry, to provide for the support of the two children of the marriage, Elizabeth Pratt Perry ("Beth") and Leonard Keegan Perry, whose name has been legally changed to Leonard Pratt Perry ("Tad");

And further, in consideration of these children, their needs and the importance of providing them the best education possible:

I, Carolyn Pratt Perry, do hereby agree and give this continuing guarantee to the said Elizabeth Pratt Perry and Leonard Pratt Perry, for the payment in full of the indebtedness, liability had/or obligation of Richard D. Perry for their support as set out in that Agreement and judgment (Exhibit "A"), as if the same due or owing by me in person, as I have done since June 23, 1975.

In recognition that the sums due by Richard D. Perry under paragraph 3(a) of said agreement (Exhibit "A") were intended to be paid to me for the support of Elizabeth Pratt Perry and Leonard Pratt Perry, I agree to pay on behalf of Elizabeth Pratt Perry and Leonard Pratt Perry the full amount of any indebtedness, obligation, liability, or sums of money that might become due from said Richard D. Perry under paragraphs 2 and 3 or any other provisions of said agreement, where said sums were or are intended for the support and welfare of Elizabeth Pratt Perry and/or Leonard Pratt Perry.

Further, this continuing guarantee and agreement to pay the aforementioned support obligations and debts of Richard D. Perry is retroactive to June 23, 1975.

IN FAITH WHEREOF, I have signed my name this 30th day of September, 1985.

/s/ Carolyn Pratt Perry
Carolyn Pratt Perry

1982, petitioner paid the employee's portion of social security taxes on behalf of Crawford.

During 1982, petitioner paid for airfare to send Beth and Tad to stay with their grandparents in Shreveport, Louisiana, during school holidays, instead of hiring a babysitter. If petitioner had hired a babysitter for those time periods, then the babysitter would have cost more than the airfare.

OPINION

## I. Bad Debt Deduction

Respondent contends that petitioner is not entitled to bad debt deductions on account of the arrearages of Perry's paragraph 3 payments because: (1) Petitioner did not establish a basis in any debt; (2) petitioner did not establish the worthlessness of her right to the paragraph 3 payments; and (3) the nonpayment of the paragraph 3 payments does not fall within the definition of a capital asset to give rise to a capital loss deduction. Alternatively, respondent maintains that, if petitioner is entitled to bad debt deductions, then the amount should be less than that claimed by petitioner, in order to prevent overlapping deductions.

Petitioner maintains that she has proven all the elements necessary to show the existence, amount, basis, and worthlessness of a debt for 1980, 1981, and 1982.

We agree with respondent that petitioner does not have a basis in the debt.

In order to deduct a nonbusiness bad debt (sec. 166(a) and (d))[13], the taxpayer must show[14] that a number of requirements have been satisfied. The requirement we examine in

---

[13]Subsecs. (a) and (d) of sec. 166 provide, in pertinent part, as follows:

SEC. 166. BAD DEBTS.
  (a) GENERAL RULE.—
    (1) WHOLLY WORTHLESS DEBTS.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

          *       *       *       *       *       *       *

  (d) NONBUSINESS DEBTS.—
    (1) GENERAL RULE.—In the case of a taxpayer other than a corporation—
      (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and
      (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 1 year.

[The subsequent amendment of sec. 166(d) by sec. 1001(b)(1) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat 494, 1011, does not affect the instant cases.]

the instant case is that the debt be one in which petitioner has a basis (sec. 166(b)).[15]

A legally enforceable divorce decree set forth Perry's obligations to make payments to petitioner. These obligations were not contingent on any expenditure by petitioner. During the years in issue, Perry was obligated to make paragraph 3 payments of $400 per month (see note 5, *supra*), regardless of whether petitioner spent little, much, or nothing at all on child support. Similarly, petitioner's expenditures were independent of Perry's court-ordered payments, and neither created nor affected the amount of the debt that Perry owed to petitioner.

When faced with this situation in *Swenson v. Commissioner*, 43 T.C. 897 (1965), we held that in such a situation the taxpayer did not have a basis in the debt, and so no deduction was allowable under section 166. Petitioner has not presented any argument which would lead us to distinguish or overrule *Swenson*.

We conclude that petitioner had no basis in the arrearages in paragraph 3 payments, and is therefore not entitled to a bad debt deduction.

Petitioner raises several arguments to support her contention that she has a basis in the debt.

Petitioner argues that the guarantee provides a basis in the debt from Perry. The guarantee did not exist during any of the years in issue; it is petitioner's attempt to create post-hoc "facts". No payments could have been made during any of those years under the guarantee. In paying for the support of Beth and Tad, petitioner was merely satisfying her own obligations to her own children.

As the mother of her children, petitioner was already effectively the guarantor of their support. Under Georgia law (Ga. Code Ann. sec. 19-7-2 (1982)), "the duty of parents

---

[14]Petitioner has the burden of proof as to 1981 and 1982. However, since respondent first disallowed the 1980 deduction in his amendment to answer, respondent has the burden of proof on this issue as to 1980. Rule 142(a); *Reiff v. Commissioner*, 77 T.C. 1169, 1173 (1981).

Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice & Procedure.

[15]SEC. 166. BAD DEBTS.

    \*      \*      \*      \*      \*      \*      \*

(b) AMOUNT OF DEDUCTION.—For purposes of subsection (a), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.

to support their children is joint and several, and does not cease upon separation or divorce of the parents." *Collins v. Collins,* 172 Ga. App. 748, 324 S.E. 2d 475, 476 (1984). Under Louisiana law (La. Civ. Code Ann. art. 227 (1952)), the obligation to support one's children "continues after separation or divorce, and applies to both mothers and fathers." *Marcus v. Burnett,* 264 So. 2d 737, 739 (La. App. 1972), affd. on this issue and modified on another issue 282 So. 2d 122 (La. 1973). Payment made on one's own obligation does not give rise to a bad debt deduction. *Dreyfuss v. Commissioner,* 140 F.2d 922 (5th Cir. 1944), affg. a Memorandum Opinion of this Court dated February 26, 1943; *Estate of Schwehm v. Commissioner,* 17 T.C. 1435 (1952). Petitioner acquired no basis in Perry's support obligation from (1) the mere execution of a document restating an obligation which was already hers or (2) the payment of support for her children.

Petitioner cites section 1.166-9, Income Tax Regs., as authority for the use of a guaranty as a basis for the nonbusiness bad debt deduction. However, that regulation deals with agreements entered into by a taxpayer in the course of that taxpayer's trade or business (sec. 1.166-9(a), Income Tax Regs.) or transactions entered into for profit (sec. 1.166-9(b), Income Tax Regs.). The guarantee shows, on its face, that petitioner entered into it in order to assure her children that their mother would provide for them even if their father did not. This motivation has nothing to do with petitioner's trade or business or her desire for profit. The cited regulation does not support petitioner's claim in the instant cases.

Petitioner brings to our attention statements from the Court of Appeals' opinion in *Imeson v. Commissioner,* 487 F.2d 319 (9th Cir. 1973), affg. a Memorandum Opinion of this Court.[16] In *Imeson,* the Court of Appeals' opinion notes our position in *Swenson;* it then suggests possible analogies to the position of "a taxpayer who pays materialmen's liens on his house after the builder has defaulted" or "a guarantor who pays the creditor when the principal debtor defaults" (487 F.2d at 320), in which events a bad debt deduction may be allowable. That opinion also suggests

---

[16]T.C. Memo. 1969-180.

analogies to the treatment of "uncollectible unpaid wages or salary" or the situation where a "taxpayer wife * * * who [pays] her and her husband's joint income tax liability" (*ibid.*), in which events a bad debt deduction is not allowable. After suggesting the existence of a problem, the *Imeson* opinion specifically states that "We do not resolve these questions" (*ibid.*).

We conclude that the materialmen's lien and guarantor analogies only serve to illustrate the shortcomings in petitioner's case. In the materialmen's lien and guarantor situations, the taxpayer's role as creditor would have arisen only when and to the extent that the taxpayer paid the original debt. In the instant cases, any debt that Perry owed to petitioner arose, and was determined as to amount, without regard to petitioner's expenditures.

We conclude that the guarantee did not provide petitioner with a basis in the support obligations.

Petitioner also argues that her financing of Perry's education[17] was an investment in his earning potential, that the paragraph 3 payments were intended to be the return on her investment in Perry (to the extent that they were not intended to be child support), and that when those payments became uncollectable, she incurred a capital loss. Petitioner's argument, in essence, is that by financially supporting Perry during 2½ years of their 8½-year marriage, she obtained a basis in the debt arising from the divorce decree. We do not agree.

Perry's obligation to make the paragraph 3 payments arose from the marital relationship and was defined by the divorce court. Petitioner's support of Perry during their marriage may well have enhanced his earning potential, but it cannot be said that petitioner supported Perry in order to acquire a right of action against him upon their subsequent divorce. *Swenson v. Commissioner*, 43 T.C. at 899. The

[17]Petitioner maintains that she has shown $12,375 of such expenditures; we have found "about $10,000". The difference arises thusly. Petitioner testified, and we have accepted, that about half of her earnings were spent on Perry's schooling. Petitioner testified as to the amounts for 1967 and 1968, and we have accepted her testimony. For 1969, petitioner has included half of her earnings for the entire year. However, we have accepted petitioner's testimony that Perry was graduated at the end of June 1969 and thereupon entered the Army. Thus, accepting petitioner's testimony, she spent half of her earnings on Perry's schooling for only half of 1969, and thus only one-fourth of her 1969 earnings were spent on Perry's schooling. This difference as to 1969 accounts for the difference between petitioner's contention and our finding of fact.

amounts that petitioner spent to help educate her husband were no more than personal expenses (see sec. 262) that do not provide her a basis in a debt.

A purported loan between family members is always subject to close scrutiny. *Caligiuri v. Commissioner,* 549 F.2d 1155, 1157 (8th Cir. 1977), affg. a Memorandum Opinion of this Court[18]; *Estate of Reynolds v. Commissioner,* 55 T.C. 172, 201 (1970). The same is true as to a purported investment. The presumption, for tax purposes at least, is that a transfer between family members is a gift. *Estate of Reynolds v. Commissioner,* 55 T.C. at 201 and cases there cited. If there ever was a written agreement between petitioner and Perry, then it would be petitioner who would be expected to produce it. If Perry ever had made payments to petitioner to evidence an obligation to repay petitioner's investment, then it would be petitioner who could show such payments. Petitioner testified and produced checks and other records. Petitioner did not testify or produce any evidence regarding Perry's obligation to repay any of the money that petitioner spent. See *Wichita Terminal Elevator Co. v. Commissioner,* 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). From this we conclude that petitioner's expenditures in 1967 through 1969 did not give rise to a debt from Perry to her.

The divorce decree deals at length in paragraph 8 with "The property jointly and/or severally held by the parties" and specifies dispositions with great particularity. There is no reference in paragraph 8 to Perry's debt to petitioner. On the other hand, paragraph 9 specifically provides that Perry "will assume responsibility for all obligations and debts of the parties which accrued prior to January 1, 1975". Paragraph 3 (see note 5, *supra*) deals, by its terms, with "payments to the wife [petitioner] as alimony, for her proper support and maintenance". Paragraph 3 obligations are separate from property divisions and pre-existing liabilities of paragraphs 8 and 9. Paragraph 12 provides that "This Agreement constitutes the entire understanding between the parties, and there are no representations or warranties other than expressly herein set forth." From this, we conclude that the divorce decree did not embody, in

---

[18]T.C. Memo. 1975-319.

the paragraph 3 payments, any obligation as to which petitioner's 1967-1969 expenditures furnished a basis.

We conclude that petitioner had no basis in Perry's support obligations for the years in issue, and consequently that petitioner is not entitled to bad debt deductions for the years in issue.

Petitioner insists that she ought to be allowed to deduct the shortfall in Perry's support payment obligations. If this were to be viewed as an appeal to public policy, i.e., the public failed to see to it that Perry satisfied his legal obligations and so the public ought to make up for this to some extent by reducing petitioner's tax obligations, then we have two responses.

Firstly, the statute for the years in issue does not embody that policy; to get that policy into the law, petitioner should go to the Congress, in which has been "vested" "All legislative Powers herein granted". U.S. Constitution, Art. 1, Sec. 1.

Secondly, since the tax benefit of such a deduction relates directly to the taxpayer's marginal tax bracket, it would appear that this claimed public policy would provide the greatest relief to those who have the greatest amount of other income and little or no relief to those who truly depended on the fulfillment of the support obligations. The Congress, of course, may enact any public policy it chooses (unless otherwise limited by the Constitution), but the policy that would be advanced by allowing such a deduction may fairly be viewed as topsy-turvy.

In any event, this Court will not so legislate in the guise of filling in gaps in the statute, or whatever other judicial power it is that petitioner would have us exercise.

We hold for respondent on this issue.

## II. Child Care Credit[19]

In the case of a taxpayer who maintains a household

[19]In her opening brief, petitioner states as follows:

The only remaining issues [sic] to be resolved by the Court is the allowance of the bad debt deduction pursuant to Section 166(d) as a result of the nonpayment of child support payments by the former husband of petitioner.

Petitioner's opening brief did not discuss the child care credit issues at all; all of her analysis on brief on the child care credit issues was in her answering brief. As a result, respondent's counsel was deprived of the opportunity to respond to petitioner's exposition of her position on this issue. In our analysis, we have taken into account that respondent's

which includes as a member one or more "qualifying individuals", section 44A(a) allows as a credit an amount equal to the "applicable percentage" (in the instant cases, 20 percent) of the "employment-related expenses"[20] paid by the taxpayer during the taxable year.

Respondent does not question that Beth and Tad were "qualifying individuals" within the meaning of section 44A(c)(1).

## A. Transportation Expenses

Respondent does not dispute that the trips to Shreveport were for the dominant purpose of assuring Beth's and Tad's well-being and to permit petitioner to be gainfully employed, or that petitioner paid the amounts for which she claimed the child care credit.[21] Rather, respondent contends that the airfare is disqualified from being an "employment-related expense", within the meaning of section 44A by section 1.44A-1(c)(3), Income Tax Regs.

Petitioner contends that she sent the children to their grandparents in Shreveport during certain school holiday

---

failure to controvert petitioner's contentions was not the result of any shortfall in respondent's position or its presentation. We considered whether we should deem petitioner to have conceded these issues. We concluded that, in the circumstances of these cases, justice would not be served by such deemed concessions.

[20]Sec. 44A(c)(2) provides as follows:

SEC. 44A. EXPENSES FOR HOUSEHOLD AND DEPENDENT CARE SERVICES NECES-
       SARY FOR GAINFUL EMPLOYMENT

       *        *        *        *        *        *        *

(c) DEFINITIONS OF QUALIFYING INDIVIDUAL AND EMPLOYMENT-RELATED EXPENSES.—For purposes of this section—

       *        *        *        *        *        *        *

(2) EMPLOYMENT-RELATED EXPENSES —

    (A) IN GENERAL —The term "employment-related expenses" means amounts paid for the following expenses, but only if such expenses are incurred to enable the taxpayer to be gainfully employed for any period for which there are 1 or more qualifying individuals with respect to the taxpayer:
      (i) expenses for household services, and
      (ii) expenses for the care of a qualifying individual.

[Pub. L. 98-369, effective for tax years beginning after Dec. 31, 1983, revised and relocated the "child care" credit. The text of sec. 44A(c)(2)(A) now appears as part of sec. 21(b)(2)(A).]

[21]On brief, petitioner states that she paid $331.50 on airfare for the children's trips to Shreveport. On brief, respondent states that petitioner spent $217.50 for this purpose. At trial, petitioner and respondent's counsel indicated that they were in agreement as to the amounts of the expenditures on this point and disagreed only as to the qualifying status. The Court's impression was that the expenditures were those shown on Exhibit 19 as $103.75, $65, $48.75, and $124—totaling $341.50. This matter is to be resolved in the computation under Rule 155.

periods because (1) her regular babysitter was not available at those times and (2) the airfare was less expensive than it would have been to hire babysitters for those periods. (This is because petitioner would have had to pay for care for about 11 hours per day during those periods, while on regular school days she merely had to pay for sitters for the afternoons.) Also, petitioner contends that the airline cabin attendants provided care to the children during their trips to Shreveport. Petitioner relies on our opinion in *Zoltan v. Commissioner*, 79 T.C. 490 (1982), as authority for treating the air travel cost as employment-related expenses.

We agree with respondent.

In pertinent part, section 44A(c) defines "employment-related expense" as either expenses for household services, or expenses for the care of a qualifying individual. Since none of the disputed expenses constitutes household expenses within the meaning of section 44A(c)(2)(i), the issue for our consideration is whether the airfare expenses were incurred for the "care" of petitioner's children within the meaning of section 44A(c)(2)(ii).

When the characterization of an expense is challenged under section 44A(c)(2)(A)(ii), the issue is resolved by reference to the specific facts at hand. Sec. 1.44A-1(c)(1)(i), Income Tax Regs.; *Zoltan v. Commissioner*, 79 T.C. at 494.[22]

In *Zoltan*, we dealt with the transportation expenses question as follows (79 T.C. at 497-498):

> Expenses incurred for transportation are subject to the disqualification provisions of section 1.44A-1(c)(3)(i), Income Tax Regs., which in pertinent part provides:

> Expenses incurred for transportation of a qualifying individual * * * between the taxpayer's household and a place outside the taxpayer's household where services for the care of the qualifying individual are provided are not incurred for the care of a qualifying individual.

> We are of the opinion that the expenses incurred for the transportation of petitioner's son to Washington are not disqualified by this language.

---

[22]As we noted (note 20, *supra*), the child care credit now appears as sec. 21. Sec. 10101(a) of the Omnibus Budget Reconciliation Act of 1987 (Pub. L. 100-203, 101 Stat. 1330, 1330-384) amended sec. 21(b)(2)(A) to provide that, for taxable years beginning after 1987, overnight camp expenses do not qualify as "employment-related expenses" for purposes of the child care credit. Sec. 21(b)(2)(A), as amended, statutorily overrides that part of *Zoltan v. Commissioner*, 79 T.C. 490 (1982), which allowed a credit for the taxpayer's sending her son to summer camp. The part of *Zoltan* with which we deal was not so overruled.

The cost of transportation from petitioner's home to the place of departure is the type of expense that this language excludes. The care of Paul Zoltan commenced at that point. The transportation by bus to Washington began *after* petitioner's son was placed under the care of the supervisors of the expedition. This transportation was inseparably tied to that care and does not fit within the disallowance provisions of section 1.44A-1(c)(4), Income Tax Regs.[14] [Emphasis added.]

[14]The type of expenses that the language of sec. 1:44A-1(c)(3)(i), Income Tax Regs., is designed to disallow is exemplified by the expenses incurred by petitioner in transporting her son to camp. In that case, her son was not released into the care of the service providers until the destination was reached. See *Warner v. Commissioner*, 69 T.C., 995, 997 (1978).

The transportation expenses in the instant cases fall on the disallowance side of the line we drew in *Zoltan*. Petitioner acknowledges on answering brief that the children were cared for on the flights by the cabin attendants. There is nothing in the record to indicate that the cabin attendants were under the direction of petitioner's parents (the services providers in the instant case). Accordingly, for reasons explained in *Warner v. Commissioner*, 69 T.C. 995 (1978), and *Zoltan*, the regulation precludes us from treating the transportation expenses as employment-related expenses.

We hold for respondent on this issue.

## B. Employee Social Security Payments.

In 1982, petitioner paid Crawford's wages and both the employer's and employee's share of social security taxes resulting from Crawford's babysitting work. Petitioner claimed a child care credit for 1982 for all of those amounts. Respondent, after concessions, disputes only petitioner's entitlement to a child care credit for paying Crawford's share of social security taxes imposed by section 3101. Respondent concedes that petitioner paid the amounts for which she claimed the child care credit.[23]

We agree with petitioner.

[23]On brief, both sides state that petitioner paid $445.94 for Crawford's employee portion of social security taxes. At trial, petitioner testified that her social security taxes payments on account of Crawford were embodied in Exhibit 19's listing of four checks in the amounts of $105.48, $383.09, $7.91, and $127.64—totaling $624.12. Petitioner testified that these checks were for the sum of her employer's share and Crawford's employee's share. At the trial, petitioner and respondent's counsel indicated that half the sum of these four checks had been allowed by respondent and that only half the sum remained in dispute. Half the sum is only $312.06, not $445.94. This matter is to be resolved in the computation under Rule 155.

Petitioner agreed to, and did, pay wages to Crawford. Petitioner agreed to, and did, pay Crawford's share of social security taxes to respondent. Petitioner's payment of Crawford's tax obligation is compensation to Crawford, just as the paid wages are compensation to Crawford. *Old Colony Tr. Co. v. Commissioner*, 279 U.S. 716, 729-730 (1929). To paraphrase section 44A, petitioner's payment of Crawford's portion of social security taxes, as part of Crawford's compensation for caring for Beth and Tad, constitutes amounts paid for the care of qualifying individuals.

The fact that Crawford could not deduct those amounts as taxes (secs. 275(a)(1)(A), and 164; *Zwiener v. Commissioner*, 743 F.2d 273, 276 (5th Cir. 1984), affg. a Memorandum Opinion of this Court[24]) does not affect the treatment of this item as compensation to Crawford (see sec. 1.164-2(f), Income Tax Regs.).

Apparently this is a matter of first impression. Perhaps it was not controverted before, because the answer seemed to be so clear. The parties insisted on disputing it now, so we take the trouble to state the obvious.

We hold for petitioner on this issue.

To take account of the parties' settlements of many of the adjustments, our determinations on the issues for decision, and the matters described in notes 21 and 23, *supra.*

*Decisions will be entered under Rule 155.*