T.C. Memo. 2002-183

UNITED STATES TAX COURT

CHARLES Y. AND JIN Y. CHOI, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 2983-98.                    Filed July 31, 2002.

A. Jerry Busby, for petitioners.

Rick V. Holser, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, Judge:  Respondent determined deficiencies in,
additions to, and penalties on petitioners' Federal income tax as
follows:

### Charles Y. Choi

| Year | Deficiency | Addition to Tax Sec. 6663 |
|------|------------|---------------------------|
| 1991 | $59,106 | $44,330 |

### Charles Y. and Jin Yi Choi

| Year | Deficiency | Additions to Tax and Penalties Sec. 6651(a)(1) | Sec. 6663 |
|------|------------|------------------|-----------|
| 1992 | $49,624 | -– | $37,218 |
| 1993 | 34,177 | $39,613 | 25,633 |

The issues remaining for our consideration are: (1) Whether Charles Y. Choi (petitioner) understated income for the taxable year 1991; (2) whether petitioners understated income for the taxable year 1992; (3) whether petitioner is liable for the civil fraud penalty under section 6663[1] for the taxable years 1991; (4) whether petitioners are liable for an addition to tax for delinquent filing of their return for 1993; (5) whether petitioners are liable for self-employment tax on their earnings from Gene's Modern Market; and (6) whether petitioners provided over one-half of the support of James Choi during 1991 and 1992 so as to be entitled to claim him as a dependent.

### FINDINGS OF FACT

Petitioner and Jin Y. Choi were married in 1992 and resided in California at the time their petition was filed. During 1991 through 1993, petitioner was the sole proprietor of Gene's Modern

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Market (Gene's), a full-service grocery store. Petitioner reported Gene's income and expenses using the cash basis method of accounting. Gene's was open for business Monday through Sunday from 9 a.m. to 9 p.m. Petitioners, along with petitioner's brother, father, and mother, worked at Gene's.

In addition to selling grocery items, Gene's cashed payroll checks, personal checks, and third-party checks for a fee of 1 percent of the face amount of the check or $1 for checks under $100. Gene's did not charge a check-cashing fee if cash was returned in connection with the purchase of groceries. The cash petitioners used for check cashing was from sales of merchandise, fees from cashing checks, and the proceeds of checks drawn on Gene's deposit account.

Two cash registers were available and used at Gene's. Although petitioner retained the cash register tapes, he did not report sales based on them or reconcile the amount of cash in the register at the end of a day's operations. Instead, petitioner fabricated daily sales summary sheets for Gene's, which were used to reflect the gross receipts for Gene's. The fabrication of gross receipts was accomplished by marking up the cost of inventory and the cost of purchases by 25 percent. Petitioner did not physically account for Gene's inventory during the years in issue. Petitioner did not provide his bookkeeper, Michael Kim, with information about cash purchases or cash sales of

Gene's.  Petitioner provided the daily summary sheets to Mr. Kim every month.

Petitioner knew that the amounts of gross receipts provided to Mr. Kim were less than the actual gross receipts for Gene's. As an example, the cash register tapes for August 1, 1992, totaled $2,925.72, whereas petitioner's summary sheets given to Mr. Kim reflected total sales of $1,325.42.  Mr. Kim prepared yearly summaries based on the daily summary sheets received from petitioner and used the summaries to prepare the Schedules C, Profit or Loss From Business, for Gene's that were included with petitioners' Federal income tax returns.  Petitioner did not provide Mr. Kim with the register tapes from Gene's.  In addition, Mr. Kim was provided with inaccurate (understated) records of cash inventory purchases.

Petitioner's method of accounting for Gene's receipts and expenditures caused the omission and understatement of income for the years in issue.  During the examination of petitioners' Federal income tax returns, petitioner estimated and represented to respondent's agent that he had understated Gene's gross receipts by approximately $15,000 per month.  Petitioner, on the basis of the actual cash register receipts, determined that Gene's gross receipts during 1991 and 1992 were $50,000 to $60,000 per month or $600,000 to $720,000 per year, respectively. On the Schedules C of the 1991 and 1992 income tax returns, gross

receipts of approximately $592,000 and $508,000, respectively, were reported.

The cash used in the operation of Gene's was maintained in a safe, and petitioner counted the cash daily. No record of the cash transactions or cash on hand was maintained, and the cash received from customers of Gene's was not deposited in the bank accounts maintained for Gene's. Some of the cash receipts from the operation of Gene's were used to pay petitioners' and their family's household and other living expenses.

During the 1991 and 1992 tax years, petitioner maintained two checking accounts in the name of Gene's. Petitioner was the only person with access to the two business accounts. The first account, No. 162-14996 (the deposit account), was used for deposits of third-party payroll and personal checks, food stamps, and WIC vouchers that were received in Gene's grocery business. No cash deposits were made with respect to the deposit account during 1991 or 1992.

The second account, No. 161-17636 (the operating account), was used for Gene's operating expenditures. Petitioner's practice was to fund the operating account by making withdrawals from the deposit account. During 1991, petitioner drafted checks made out to "cash" from the deposit account in the total amount of $2,045,900, $625,700 of which was deposited into the operating account. During 1992, petitioner drafted checks made out to

"cash" from the deposit account in the total amount of $1,293,600, $582,200 of which was deposited into the operating account.

In 1992, petitioner purchased a house in Glendale, Arizona, for $208,250. A downpayment of $41,650 was made on the home. Petitioner applied for a loan to finance the purchase. He reflected on the loan application that the net worth of Gene's was $269,115 and that his monthly income from Gene's was $7,197. In 1994, petitioner sold Gene's for $259,790.

On their 1991, 1992, and 1993 income tax returns, petitioners reported net profit from Gene's of $6,696, $13,363 and $67,126, respectively. On the 1991 and 1992 returns, petitioners claimed petitioner's parents and brother as dependents. Petitioner knew that the gross receipts reported for 1991 through 1993 were understated. He omitted some gross receipts in order to avoid tax so that he would have more retained cash.

Respondent conducted a civil examination of petitioners' income tax returns, and petitioners did not provide the internal revenue agent with the cash register tapes. Invoices for purchases by check were presented, but no invoices were provided for cash purchases. During the examination, petitioner stated that he was the sole source of support of his parents.

Because of the inadequacy of petitioners' records and accounting practices, respondent reconstructed petitioners' income using an indirect method.  Using the bank deposits and cash expenditures method, respondent determined that petitioner's unreported income for 1991 was as follows:[2]

Bank Deposit and Expenditures Reconstruction for 1991

Bank Deposit Summary

| | | |
|---|---|---|
| Acct. no. 162-14996-- bus. deposit acct. | | $2,066,381 |
| Acct. no. 161-17636-- bus. operating acct. | | 625,700 |
| Acct. no. 166-67322-- personal checking acct. | | 4,600 |
| Total gross bank deposits | | 2,696,681 |

Add

| | | |
|---|---|---|
| Personal cash expenditures | | $16,200 |
| Business cash expenditures | | 149,602 |
| Subtotal | | 2,862,483 |

Subtract

| | | |
|---|---|---|
| Checks written to cash: | | |
| Deposited into operating account | $625,700 | |
| Amount of checks not deposited | 1,420,200 | |
| Subtotal | 2,045,900 | |
| | | ($2,045,900) |
| Nontaxable income | | (1,000) |
| Business gross receipts | | 815,583 |
| | | |
| Per audit | | $815,583 |
| Per return | | 591,910 |
| Unreported income | | 223,673 |

---

[2] All of the amounts used by respondent in the bank deposits reconstruction for 1991 and 1992 are supported by facts in the record of this case.

Respondent determined that petitioners' unreported income for 1992 using the bank deposits and cash expenditures method was as follows:

Bank Deposit and Expenditures Reconstruction for 1992

Bank Deposit Summary

| | |
|---|---:|
| Acct. no. 162-14996-- bus. deposit acct. | $1,298,435 |
| Acct. no. 161-17636-- bus. operating acct. | 582,200 |
| Acct. no. 166-67322-- personal checking acct. | 35,430 |
| Total gross bank deposits | 1,916,065 |

Add

| | |
|---|---:|
| Personal cash expenditures | 2,700 |
| Business Cash Expenditures | 85,671 |
| Subtotal | 2,004,436 |

Subtract

| | | |
|---|---:|---:|
| Checks written to cash | | |
| Deposited into operating account | $582,200 | |
| Amount of checks not deposited | 711,400 | |
| Subtotal | 1,293,600 | |
| | | ($1,293,600) |
| Nontaxable deposits | | (40,998) |
| Business gross receipts | | 669,838 |
| Per audit | | $669,838 |
| Per return | | 508,049 |
| Unreported income | | 161,789 |

During November 1994, respondent began a criminal investigation of petitioner, and on November 25, 1996, petitioner waived indictment and pleaded guilty to criminal tax evasion

under section 7201[3] for 1992.  In the process of his plea agreement petitioner averred that:  (1) He and his spouse had a substantial income tax due and owing to the United States for the year 1992; (2) he evaded tax by filing and causing to be filed with the Internal Revenue Service a false and fraudulent Form 1040, U.S. Individual Income Tax Return, for the calendar year 1992 in which he substantially underreported gross receipts; (3) he acted willfully, with intent to defraud the Government of the tax on the additional unreported income.  Petitioner was sentenced to 12 months in prison and required to pay a $20,000 fine.

Petitioner's father obtained a favorable judgment from a civil court in Korea on May 17, 1991, which was appealed, and the appeal was dismissed on May 18, 1993.  The payment of the judgment was not available to petitioner's father and mother until some time during 1993 or 1994.

---

[3] Sec. 7201 provides:

Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the cost of prosecution.

OPINION

Although we consider several issues in this case, the two primary issues involve the reconstruction of petitioners' income for 1991 and 1992 and whether any part of the 1991 underpayment of tax is attributable to fraud.[4] The main thrust of petitioners' attack focuses on respondent's use of a bank deposits analysis to reconstruct petitioners' income.

Taxpayers are required to maintain records sufficient to show whether they are liable for Federal income taxes. See sec. 6001; DiLeo v. Commissioner, 96 T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992). If a taxpayer fails to keep records, the Commissioner may reconstruct the taxpayer's income. See sec. 446(b); Holland v. United States, 348 U.S. 121, 130-132 (1954); Parks v. Commissioner, 94 T.C. 654, 658 (1990).

The records petitioner maintained for purposes of reporting the income and deductions of Gene's were inadequate. Petitioners do not argue that the books and records were accurate or adequate.[5] Petitioner admitted that he understated the gross

_____

[4] In a Dec. 21, 2000, order, respondent's motion for partial summary judgment was granted, and it was held that "petitioner Charles Y. Choi is estopped from denying that he is liable for a fraud penalty, under section 6663, I.R.C., to the extent that there is any deficiency finally determined to which a fraud penalty would be applicable for the 1992 taxable year."

[5] Petitioners have attempted to discredit respondent's bank deposits reconstruction of income by offering their own reconstruction using the percentage markup method. The
(continued...)

receipts on the daily sales summaries.  In an interview with a revenue agent, petitioner estimated that he could have understated the gross receipts for Gene's by as much as $15,000 per month.  As of the time of trial, petitioner was not able to produce most of the cash register tapes for Gene's, and no records of cash balances, cash receipts, cash expenditures, or inventories were maintained except for a few invoices for cash purchases of inventory.  Because the records for Gene's could not be reconciled with petitioners' income tax returns, respondent reconstructed the gross receipts of Gene's by means of the bank deposits method coupled with the cash expenditures method.

The bank deposits and cash expenditures methods are acknowledged methods of reconstructing income.  See Parks v. Commissioner, supra; Nicholas v. Commissioner, 70 T.C. 1057, 1065 (1978).  Respondent's bank deposits analysis reflects that petitioners had substantial unreported income from Gene's business operations during 1991 and 1992.  Gene's was petitioners' only source of business income.  Respondent's agent examined petitioners' records and also performed an analysis of bank deposits for the years in issue.  The bank deposits analysis was accomplished by totaling the deposits made to petitioners'

[5](...continued)
percentage markup method of reconstruction is one whereby an established base, such as cost of goods sold, is marked up to reconstruct gross sales or gross receipts.

three bank accounts. Respondent then added petitioners'
identified cash expenditures for personal and business purposes
to the total bank deposits. The total of the bank deposits and
expenditures was next reduced by the total amount of nontaxable
deposits to arrive at petitioners' annual income from Gene's.
Finally, the annual income was reduced by the income reported on
petitioners' returns to arrive at respondent's determination of
petitioners' unreported income of $223,673 and $161,789 for 1991
and 1992, respectively.

The items included in respondent's reduction for nontaxable
items included deposits from the deposit account to the operating
account, transfers from other accounts, gifts, and loans made to
the business or petitioners. The cash for Gene's check cashing
came from business operations. Some of the cash was from cash
sales of groceries, and some was obtained from the deposit
account.

Respondent did not attempt to separately determine the
amount of gross receipts from cash sales of groceries. In
addition, respondent considered the entire amount of cash
withdrawn from the deposit account to be nontaxable.
Accordingly, respondent's approach to reconstructing petitioners'
income was conservative, allowing petitioners the benefit of the
doubt. In addition, some of the cash from cash grocery sales was

maintained in a safe at Gene's and was used by petitioner and his family for personal expenses.

Petitioners argue that additional bank deposits should be eliminated as nontaxable because they represent cash gifts from petitioner's parents. Petitioner, his parents, and several close relatives testified that petitioner's parents received cash from Korea, and that cash gifts were made to petitioner by his parents. The record reflects that petitioner's father had instituted a lawsuit in Korea and that he had won a judgment in his favor. The record also reveals that the judgment was appealed and that petitioner's father was successful on appeal, but the appeal did not conclude until May 1993. Respondent points out that under the laws of Korea, petitioner's parents were not entitled to expatriate the proceeds of the judgment from Korea to the United States. There is also evidence in the record that certain American Express traveler's checks did not become available to petitioner's parents until sometime during 1994.

In an attempt to show that petitioner's parents had the means to make gifts, petitioners offered the testimony of close relatives (uncles, aunts, etc.), each of whom testified that on specific dates in 1991 and 1992 they received large amounts of cash ($20,000 to $30,000) on behalf of petitioner's parents. The witnesses each stated that they received the cash in stacks of

$100 bills from unknown individuals who had traveled to the United States from Korea.

We note at the outset that intrafamily transactions are subjected to closer scrutiny. Caligiuri v. Commissioner, 549 F.2d 1155, 1157 (8th Cir. 1977), affg. T.C. Memo. 1975-319; Perry v. Commissioner, 92 T.C. 470, 481 (1989), affd. 912 F.2d 1466 (5th Cir. 1990). The witnesses' stories were strikingly similar, and, curiously, none of the witnesses knew the person who gave them the alleged currency. We also find it curious that the alleged deliveries of relatively large amounts of currency were given to different family intermediaries of petitioner's parents and that no deliveries were made directly to petitioner's parents. Finally, there is no documentary evidence of the existence of the alleged cash that petitioners argue was infused into the operation of Gene's. In particular, the three bank accounts in this record do not reflect the deposit of any cash.[6]

With respect to petitioners' cash gift argument, respondent notes that the alleged cash was not available from the Choi families' Korean lawsuit, at very least, until 1993, whereas all of the witnesses testified to receiving the money during 1991 and 1992. Because this case involves a reconstruction for 1991 and 1992, it is imperative that petitioners show the infusion of cash

---

[6] The deposit account received check deposits from Gene's, and the operating account received transfers from the deposit account.

in those years to reduce the amount of the deposits that would be deemed income. Significantly, respondent points out that his bank deposits reconstruction represents only check deposits because no cash was deposited into the deposit account for Gene's.

Petitioners attempt to convince us that some of the cash that was used to cash checks came from petitioner's parents, as opposed to cash from the sale of groceries. Admittedly, by intentionally not relying on the cash register tapes, petitioner omitted cash sales of groceries from the income reported to respondent. Respondent, by including all checks that were deposited into deposit accounts, included some checks that were exchanged by Gene's customers for cash only or cash and groceries. Respondent, however, by eliminating all of the transfers to the operating account, gave petitioners the benefit of the doubt by allowing all of petitioners' expenditures, including expenses of Gene's, cash for check cashing, and also personal expenses of petitioners and their family. Considering respondent's conservative approach, it is likely that respondent's reconstruction did not capture some portion of the income derived from the cash sales of groceries. In connection with respondent's bank deposits analysis, however, some income from cash sales may have been included in the cashed checks deposited in the deposit account. Respondent's eliminations from

the bank deposits analysis would have likely addressed any such inclusion. To the extent any cash from check cashing was a part of the bank deposits analysis, it is unlikely that it is attributable to cash gifts from petitioner's parents.

We find the testimony offered on this point by petitioners and their relatives to be self-serving, vague, and uncorroborated. Petitioner's parents could not recall the incremental amounts, dates, or total amount allegedly given to petitioners and/or infused into Gene's operation. No gift tax returns were filed by petitioner's parents, and no record exists of the alleged transfers. Additionally, during the years under consideration, petitioner supported his father and mother, both of whom worked at Gene's and lived under petitioners' roof. In the absence of persuasive evidence and reliable corroboration, we are not required to accept the self-serving testimony of interested parties. See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

Petitioners, in an attempt to discredit respondent's reconstruction, offered their own reconstruction of income using the percentage markup method. They maintain that the percentage markup method of reconstructing income would more accurately reflect petitioners' income for the years in issue. In particular, petitioners argue that a large percentage of the checks deposited and included in respondent's bank deposits

reconstruction was attributable to check cashing and not to the sale of merchandise.

Petitioners called Patrick Schindele as an expert witness to provide a report and to testify in support of their argument. Mr. Schindele's report contained a reconstruction of Gene's gross receipts using the percentage markup method. His approach, however, was flawed in several respects. Because of petitioners' inadequate records, Mr. Schindele's report, in large part, is based on assumptions. Many critical assumptions were based on information provided by petitioners and not developed by Mr. Schindele's independent analysis.

Mr. Schindele had to make numerous assumptions in order to reconstruct the amount that he believed represented Gene's gross receipts. The amounts used, however, could not be supported or verified. He also assumed that only a small portion of customers' checks was for the purchase of merchandise. Conversely, he assumed that either most checks were cashed at face value or that nominal amounts of grocery purchases were involved in the transactions. Because of petitioners' lack of records, the register tapes in particular, there is no way to know whether Mr. Schindele's assumption is correct.

We find Mr. Schindele's assumption that the majority of customers who paid by check bought only nominal amounts of groceries and merely went to Gene's for cash to be highly

unlikely. We also note that Gene's did not receive a check-cashing fee if cash was returned in connection with the purchase of groceries. On the basis of the record, this assumption is, at best, highly speculative.

Mr. Schindele also assumed that the cash from these check purchases described above was "used to cash payroll checks or for cash purchases of inventory". In that way, Mr. Schindele attempted to neutralize the possibility of income reposing in customers' cashed checks. Here again such assumptions are purely speculative and unverified. We note that the lack of records to support such assumptions was of petitioner's own making and was intended to conceal the true amount of reportable income.

Because petitioner did not account for Gene's inventory, either at the beginning or at the end of a taxable year, and inadequate records were kept of cash purchases, it is not possible to determine Gene's cost of goods sold--the base on which Mr. Schindele employed the percentage markup method.

Mr. Schindele's report was also flawed in connection with the amount of the percentage markup used. In that regard, his trial testimony conflicted with his written report. The report contains the statement that Mr. Schindele determined the percentage markup through interviews of petitioners and of "some of the vendors of Gene's Market." Mr. Schindele later testified that he did not interview any of Gene's vendors to establish the

markup of inventory, and thus he based the amount of the percentage markup entirely on interviews with petitioners.

Because of those flaws and weaknesses, we place no reliance on petitioners' expert's opinion. Moreover, respondent's bank deposits analysis was properly and conservatively used. Therefore, petitioners have not shown that the percentage markup method they used would more accurately reflects Gene's gross receipts for the years in issue. Accordingly, respondent's determinations with regard to petitioners' understatements of income is upheld for 1991 and 1992.

Having decided that there was unreported income for 1991 and 1992, we now consider, for 1991, whether the understatement was due to fraud within the meaning of section 6663.[7] Respondent determined that petitioner fraudulently and with intent to evade income tax understated his income by omitting $223,673 and $161,789 of gross receipts for 1991 and 1992, respectively.

Fraud is defined as an intentional wrongdoing designed to evade tax believed to be owing. Edelson v. Commissioner, 829 F.2d 828, 833 (9th Cir. 1987), affg. T.C. Memo. 1986-223. Respondent bears the burden of proving fraud by clear and convincing evidence. Rule 142(b).

In order to prove fraud, the Commissioner must show the

---

[7] Respondent has conceded that petitioner Jin Y. Choi is not liable for the fraud penalty for the 1991 tax year.

existence of an underpayment and that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Parks v. Commissioner, 94 T.C. at 660-661. In this case, respondent has shown the existence of underpayments for 1991 and 1992.

The existence of fraud is a question of fact to be resolved upon consideration of the entire record. DiLeo v. Commissioner, 96 T.C. at 874. Fraud is never presumed and must be established by independent evidence of fraudulent intent. Edelson v. Commissioner, supra. Fraud may be shown by circumstantial evidence because direct evidence of the taxpayer's fraudulent intent is seldom available. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner, 56 T.C. 213, 224 (1971).

To decide whether the fraud penalty is applicable, courts have considered various indicia or "badges of fraud", which include: (1) Understatement of income; (2) inadequate books and records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealment of assets; (6) failure to cooperate with tax authorities; (7) engaging in illegal activities; (9) lack of credibility of the taxpayer's testimony; and (10) dealing in cash. Bradford v. Commissioner,

796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Recklitis v. Commissioner, 91 T.C. 874, 910 (1988). This list is nonexclusive. Although no single factor is necessarily sufficient to establish fraud, the combination of a number of factors constitutes persuasive evidence of fraud. Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603; Miller v. Commissioner, 94 T.C. 316, 334 (1990).

The record in this case supports our holding that petitioner fraudulently intended to evade 1991 and 1992 income tax. Petitioner was receiving the proceeds from Gene's, and he intentionally and consistently understated that income. His testimony was evasive and to some extent not credible. Petitioner fabricated records of income and intentionally discarded cash register tapes, which would have shown the true sales of Gene's. He concealed income by fabricating his daily sales summary sheets and admitted to respondent's agents that he underreported the sales income of Gene's by approximately $15,000 per month. Petitioner dealt in cash and did not maintain records of his cash transactions involving the purchase of inventory. Petitioner pleaded guilty to and was convicted of criminal income tax evasion under section 7201 for the year 1992. In that regard, we have already held that petitioner is collaterally estopped from denying that part of the underpayment for 1992 is

due to fraud within the meaning of section 6663. See <u>DiLeo v. Commissioner</u>, <u>supra</u> at 885-886; <u>Amos v. Commissioner</u>, 43 T.C. 50, 54-56 (1964), affd. 360 F.2d 358 (4th Cir. 1965).

Respondent has shown by clear and convincing evidence that petitioner fraudulently understated income for 1991. The classic indicia of fraud have been shown in this case. Respondent has shown: A pattern of fraudulent activity; concealment; and large consecutive understatements of income. In addition, we have considered the fact that petitioner pleaded guilty to criminal tax evasion for 1992, a year in which the pattern of activity and gravity of the understatement were essentially the same as in 1991.

Respondent also determined that petitioners were liable for self-employment tax under section 1402 on the earnings from Gene's. Earnings from self-employment are income derived by an individual from any trade or business carried on by the individual. Petitioners did not brief[8] this issue, and there is nothing in the record showing respondent's determination to be in error. Accordingly, petitioners are liable for self-employment tax on the earnings from Gene's.

---

[8] With respect to the final two issue discussed in this opinion, petitioners failed to present argument, reply to respondent's argument, or otherwise discuss the issues in their briefs. Failure to discuss an argument on brief has been held to constitute an abandonment of the controversy. See <u>Rybak v. Commissioner</u>, 91 T.C. 524, 566 n.19 (1988).

Finally, respondent disallowed a dependency exemption that petitioners claimed for petitioner's brother, James Choi. Respondent determined that petitioners were not entitled to claim the exemption because they had not shown that they provided more than one-half of the support for James Choi as required under sections 151(c) and 152(a). Petitioners must show that they provided more than 50 percent of the support to be entitled to claim the dependency exemption for 1991 and 1992. See Morrison v. Commissioner, T.C. Memo. 1975-73; Johnson v. Commissioner, T.C. Memo. 1974-150.

Respondent contends that the evidence shows that James Choi worked full time in Gene's in exchange for the payment of his living expenses. Petitioners did not brief this issue and have not shown that they provided more than one-half of James Choi's support. Accordingly, we hold that petitioners are not entitled to the claimed dependency exemption.

To reflect the foregoing,

Decision will be entered

under Rule 155.